IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>PWR INVEST, LP, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11164 (JTD)<br>(Joint Administration Requested) |

**DECLARATION OF MARK REED IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Mark Reed, hereby declare under penalty of perjury:

1.  I am President of Oklahoma Merge, L.P. (together with its affiliate debtors, the "Debtors"), a Delaware limited partnership. I am familiar with the day-to-day operations, business, and financial affairs of the Debtors.

2.  I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of the Debtors' chapter 11 cases and in support of the (i) Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the dates specified herein and (ii) the relief, in the form of motions and applications, that the Debtors have requested of the Court (the "First Day Pleadings").

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Oklahoma Merge, LP (1308), Oklahoma Merge Midstream, LP (8433), Oklahoma River Basin, LP (0385), PWR Oil & Gas General Partners, Inc. (4963), and PWR Invest, LP (7429). The mailing address for the Debtors, solely for purposes of notices and communications, is: 3710 Rawlins St., Suite 1100, Dallas, Texas 75219, with copies to Pronske & Kathman, P.C., c/o Jason P. Kathman, 2701 Dallas Pkwy, Suite 590, Plano, Texas 75093 and Barnes & Thornburg LLP, c/o Kevin G. Collins, 1000 N. West Street, Suite 1500, Wilmington, Delaware, 19801.

1

3. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other employees and representatives of the Debtors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

4. This Declaration is intended to provide a summary overview of the Debtors' businesses and these chapter 11 cases. Sections I through III provide a description of the Debtors' businesses, history and organizational structure, prepetition indebtedness, and the circumstances giving rise to the commencement of these chapter 11 cases. Part IV summarizes the First Day Pleadings and the relief they seek, which the Debtors believe are crucial to its successful reorganization.

**I.    THE DEBTORS**

5. Oklahoma Merge, L.P. ("Merge") was formed in 2017 to purchase and develop oil and gas properties. Debtor PWR Invest, L.P. ("PWR Invest") was formed to hold the limited partnership interests in the Subsidiary Debtors. PWR Invest is owned 99.99% by three limited partners and .01% by GP PWR Invest, Inc. PWR Invest owns 99.99% of the limited partnership interests in Debtors Merge, Oklahoma River Basin, LP ("River Basin"), and Oklahoma Merge Midstream, L.P. ("Midstream", and together with Merge and River Basis, the "Subsidiary Debtors"). Debtor PWR Oil and Gas General Partners, Inc. ("PWR GP") is the general partner of each of the Subsidiary Debtors and owns a .01% general partnership interest in each of the Subsidiary Debtors. PWR GP is a wholly-owned subsidiary of PWR Invest. A detailed corporate organization chart is attached hereto as **Exhibit A**.

### A. Debtor's Reserves

6. The Debtors' primary assets consist of producing and non-producing oil, natural gas, and NGL reserves (collectively, the "O&G Reserves"), which are working interests that provide the Debtors with the right to drill, produce, and maintain wells in specific geographic regions.

7. As of the Petition Date, the Debtors own working interests in seventy-eight (78) active producing wells. In addition to those seventy-eight wells, the Debtors and their non-Debtor affiliates are currently fracking or finishing two other wells. As of the Petition Date, the Debtors own interests in approximately 10,500 acres in the Eastern Anadarko Basin of Oklahoma, with approximately 9,500 of that acreage concentrated in large blocks located in an area commonly referred to as the "merge" area of the STACK/SCOOP plays. The Debtors and their non-Debtor affiliates are the operator for approximately seventy percent (70%) of the acreage located in the "merge" area.

8. As of July 1, 2019, the Debtors had estimated net proved developed producing reserves of approximately 704.25 thousand barrels of oil ("MBbls"), 7,747.63 million cubic feet ("MMcf") of natural gas, and 34,253.39 thousand of gallons ("Mgal") of NGLs.

### B. Shared Services

  i.  *Management Agreement*

9. Much of the Debtors' business is conducted by non-Debtor affiliates, including Gaedeke Oil and Gas Operating, LLC ("Gogo"), Gaedeke Group, LLC ("Gaedeke Group"), and Gaedeke Energy, LLC ("Gaedeke Energy"). Gogo provides its services to Merge pursuant to that certain Management Agreement dated as of February 23, 2017, attached hereto as **Exhibit B**, by and between Merge and Gogo (as amended, supplemented, or modified from time to time, the

"Management Agreement"). Pursuant to the Management Agreement, Gogo provides Merge with services such as accounting, engineering, geology, land, human resources, tax, office space and administrative services. As a result of the Management Agreement and Merge's relationship with Gogo, the Debtors benefit from the technical expertise of Gogo while minimizing costs by sharing the costs of those individuals with other entities.

10. The Management Agreement provides for a management fee to be charged by Gogo to Merge of five and one-half percent (5.5%) of monthly total revenues. Further, the Management Agreement specifies that the management fee is payable as an operating expense of Merge and that Gogo is authorized to deduct the amount from Merge's share of the oil gas revenues received on the Debtors' Reserves. In addition to the management fee, Gogo is authorized to pay operating expenses and "where legal assistance is needed for the benefit of the Project, such assistance shall be through legal counsel. Expenses for such counsel shall be borne by [Merge]." Gaedeke Group employs certain accountants and in-house counsel to provide accounting and legal services to the Debtors through the Shared Services. The Management Agreement expressly provides that to the extent legal services are provided by Gaedeke Group's employees (via Gogo), such amounts are reimbursable from Merge. Accordingly, and in conjunction with the Management Agreement, Gogo calculates on a monthly basis the amount of the management fee and any other expenses and costs attributable to Merge and either offsets those amounts against revenues paid to Merge, or makes the necessary adjustment to the applicable intercompany account.

    ii.  *Other Shared Services and Employees.*

11. In addition to the general and administrative services provided under the Management Agreement and describe above, many of the Debtors' other operational functions are provided by non-Debtor affiliates. For example, insurance for Gogo is provided under various

"master" policies, which the Debtors are added as "additional insureds." Gogo pays the premiums under the master policies and the Debtors subsequently settle obligations against, or reimburse, Gogo for their allocable share of insurance premiums. Each of the individuals who work for the Debtors are employed by Gaedeke Group. Gaedeke Group provides compensation and benefits to the employees. Gaedeke Group bills Gogo for those costs and expenses, which are then passed-on to Merge via the Management Agreement.

## II. PREPETITION INDEBTEDNESS

### A. Chambers Loan

12. As explained in more detail below, when oil and gas commodity prices historically crashed in the fall of 2017, the Debtors' prospects of selling their reserves and leased acreage was dramatically impacted. In order to service and maintain its existing reserves, Merge entered into that certain Credit Agreement dated as of December 22, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), by and among Merge, as borrower, each of the lenders from time to time party thereto, Chambers Energy Management, LP ("Chambers" or "Prepetition Secured Lender"), as administrative agent. The Credit Agreement has been amended twice, most recently on September 27, 2018.

13. As of the Petition Date, there is approximately $74 Million owed under the Credit Agreement. The Credit Agreement is a non-recourse obligation secured by substantially all of Merge's assets, including Merge's leasehold interests, receivables, prepetition deposit accounts and equipment. Further, River Basin pledged all of its leasehold and mineral interests to secure Merge's payment of the Credit Agreement. In addition to River Basin's pledge of its leasehold and mineral interests, PWR Invest and PWR GP each pledged all of their respective limited partner and general partner interests in Merge and Midstream.

B.     **Sub-Debt Loans.**

14.    Merge previously entered into a demand promissory note, pursuant to which, among other things, Gaedeke Holdings VII, Ltd. ("GH VII") provided Merge a line of credit (the "Original Loan"), which loan was evidenced by that certain promissory note made by Merge in favor GH VII, dated as of February 23, 2017, in a principal amount up to $50,000,000.00 (the "Original GH VII Note"). In connection with the execution of the Credit Agreement, Merge and GH VII agreed to execute a Subordinated and Amended Restated Promissory Note, dated December 20, 2017 (the "Restated GH VII Note"). As of the Subsidiary Petition Date, there was approximately $20 Million owed under the Restated GH VII Note.

### III.    EVENTS LEADING TO CHAPTER 11 FILINGS

15.    A number of the Debtors' leases were set to expire in the summer of 2017. In anticipation of the expiration dates and to assist in the preparation of drilling, the Debtors hired Bronze Four, a drilling consultant company, to advise and assist with the Debtors' drilling plan. Simultaneously, the Debtors engaged Royal Bank of Canada to market the Debtors' acreage for sale in the summer of 2017. Ultimately, the Debtors were unable to sell their oil and gas assets in the summer and fall of 2017. When the Debtors were unable to sell their oil and gas assets, the Debtors began to explore and investigate other sources of financing to drill their wells.

16.    The Debtors closed the financing with Chambers in December 2017, a loan agreement with an incredibly high interest rate. During the latter part of 2017 and 2018, the Debtors drilled 13 horizontal wells. Eleven of the thirteen wells were drilled to the Woodford formation, because drilling to the Woodford allowed the Debtors to hold lease for both the Woodford formation and Mississippian formation.

17. Multiple negative factors influenced the Debtors' financial situation. First, as often occurs in large drilling projects, the Debtors were over budget. One well in particular was over $5 Million over budget due to drilling difficulties. More importantly though, once the wells began producing, the Debtors' well did not perform as well as anticipated and were producing lower than the performance of other wells in the immediate area. Finally, in retrospect, it appears that the Woodford formation is inferior to the Mississippian formation.

18. In October 2018, the Debtors engaged the financial advisory firm PJ Solomon to market and sell the properties. At the onset of the engagement, oil had largely rebounded from the dramatic drop that occurred in 2015 and was trading at a four-year high of around $74 per barrel for West Texas Intermediate. However, shortly after PJ Solomon was engaged, oil again dramatically dropped (over 30%) making marketing and sale of the properties increasingly more difficult.

19. In the third quarter of 2018, with potential defaults related to the financial covenants under the Credit Agreement looming, Chambers required the Debtors (in order to obtain a waiver of any such financial covenant defaults) to invest an additional $8 Million in equity. The equity infusion was reflected in that certain Second Amendment to Credit Agreement dated as of September 27, 2018. Even though the Credit Agreement is non-recourse, Chambers required that the investment be in the form of equity.

20. Beginning in the fall of 2018, and extending into the spring of 2019, Chambers began threatening to declare defaults and exercise rights under the loan documents if certain payments and capital infusions were not made. In response, the Debtors and their management began negotiating with Chambers on a mutually agreeable forbearance agreement. However, certain of collateral documents executed by PWR Invest and PWR GP pledge their interests in the

Subsidiary Debtors, such that there was concern that Chambers may be able to take control of the Subsidiary Debtors and preclude their bankruptcy filing.

21. Accordingly, on May 22, 2019 (the "PWR GP Petition Date"), PWR GP filed its voluntary petition under chapter 11 of the Bankruptcy Code. The next day, on May 23, 2019 (the "PWR Invest Petition Date", and together with the PWR GP Petition Date, the "Parent Petition Dates"), PWR Invest filed its voluntary petition under Chapter 11 of the Bankruptcy Code.

22. After the Parent Petition Dates, the Debtors continued discussions with Chambers in an attempt to reach an out-of-court agreement to restructure the outstanding indebtedness. After several weeks of negotiations, the parties were unable to reach an agreement, and the Subsidiary Debtors each filed voluntary petitions for bankruptcy under Chapter 11 in order to protect their assets and restructure their balance sheets.

## IV.    SUMMARY OF FIRST DAY PLEADINGS

23. Concurrently with the filings of the voluntary petitions, the Debtors have filed, for the Court's approval, a number of First Day Pleadings, which the Debtors believe are necessary to enable them to operate in chapter 11 with a minimum of disruption and loss of productivity. The Debtors respectfully requests that the each of the First Day Pleadings be granted, as they are a critical element to facilitating the Debtors' smooth and orderly operations with minimal disruption during the pendency of the chapter 11 cases.

24. I am familiar with the content and substance of the First Day Pleadings. In my opinion, approval of the relief sough in each of the motions is critical to successfully implementing Debtors' chapter 11 strategy efficiently and with minimal disruption to their business operations.

25. A description of the relief requested and the facts supporting each of the First Day Pleadings is set forth below.

### A. Cash Collateral

26. *Debtors' Motion for Entry of Interim and Final Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "CC Motion") seeks the entry of an interim order, substantially in the form attached to the CC Motion (the "Interim CC Order") (i) authorizing the Debtor to use cash collateral (as defined in section 363(a) of the Bankruptcy Code, ("Cash Collateral") pursuant to the terms specified in the Interim CC Order attached to the CC Motion; (ii) granting adequate protection to the Prepetition Secured Lender; (iii) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim CC Order; and (iv) scheduling a final hearing to consider the relief requested in the Motion on a final basis and the entry of a final order (the "Final CC Order", and together with the Interim Order, the "Cash Collateral Orders") approving the relief requested in the CC Motion.

27. As described and explained above, the majority of the Debtors' income and revenue is derived from the Debtors' reserves, which are subject to Chambers' liens. The Debtors project that they will continue to need the liquidity and cash generated from the reserves post-petition to fund their operations and pay the costs and expenses of administering the chapter 11 cases.

28. The Debtors intend to work with Chambers to negotiate an agreement on the use of cash collateral on a consensual basis, including providing adequate protection.

### B. Royalty Motion

29. Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Pay Oil and Natural Gas Obligations and (II) Granting Related Relief* (the "Royalty Motion"), the Debtor seeks interim and final orders: (a) authorizing the Debtors to pay or

honor prepetition and post-petition royalty obligations, working interest obligations and other obligations related to oil and gas leases, and (b) scheduling a final hearing to consider entry of the final order, to the extent necessary.

30. Merge owns interests in certain oil and gas Leases, which obligate it to remit payments to the Royalty Interest Owners (as that term is defined in the Royalty Motion) for their share of the proceeds from the sale of hydrocarbon production from producing wells. Similarly, the oil and gas lease are subject to certain overriding royalty interests, which require payment out of the gross proceeds from the sale of oil produced from the Debtors' reserves.

31. The Debtors are under a number of pooling orders (the "Pooling Orders") whereby the Debtors' acreage is "pooled" together with other entities who own acreage abutting or attached to the Debtors' acreage. Under certain of the Pooling Orders, Merge has the right to designate the operator. As of the Petition Date, Merge has the right to designate the operator for thirteen (13) of the approximately seventy-eight (78) wells it owns an interest. As explained more fully in the Shared Services Motion filed contemporaneously herewith, Merge contracts with a non-debtor affiliate, Gogo to operate each of the thirteen wells in which it has the right to designate the operator. Gogo, on behalf of Merge, sells oil to Coffeyville Resources, Sunoco and Phillips 66, and sells its gas to Blue Mountain Midstream and Enable Gathering and Processing (collectively, the "Gatherers"). The Gatherers typically pay Gogo for oil purchases towards the middle of each month for production gathered the month prior, and for gas and NGL purchases sixty days in arrears.

32. Pursuant to the Pooling Orders, for the wells where Merge is designated as the operator (or has the right to designate the operator), Merge is obligated to market oil and gas production on behalf of certain owners of non-operating working interest (the "Non-Op WI Owners"). After the sale of the marketed production and the receipt of revenue related thereto,

Merge is required to remit to the Non-Op WI Owners their share of the proceeds net of all applicable payments to royalty interest and overriding royalty interest owners and deductions (the "NonOp WI Obligations").

33. For the other wells in which Merge does not designate the operator, it owns non-operator working interests. Pursuant to the Pooling Orders, for the wells in which Merge is not the operator, it is required to reimburse the operators designated under the Pooling Orders for Merge's share of the production costs (the "JIB Obligations") through payment of joint interest billings ("JIBs"). Where Merge is not the operator, it receives JIBs from the designated operator. For the wells where Merge is the designated operator, Merge receives JIBs from Gogo. Rights to payments of JIBs are often secured under contractual lien rights or statutory lien rights in favor of the operator against the Debtors' interest in the well or are subject to recoupment and setoff. Here, because Merge is a party to the Pooling Orders, there is the additional judicial requirement. Consequently, the failure to pay the JIBs could jeopardize the Debtors' ability to capitalize on revenue received from their oil and gas reserves.

34. By the Royalty Motion, the Debtors request the authority, but not the direction, to continue remitting any prepetition JIB payments in the ordinary course of business on a post-petition basis.

35. In the ordinary course of business, Merge also incurs severance taxes (the "Severance Taxes") that must be remitted to the Oklahoma Tax Commission for oil and gas production each month. The Gatherers generally pay the Severance Taxes and then deduct the corresponding amount from the amounts they pay Gogo on account of the purchased oil. Merge seeks authority to allow the Gatherers to continue to deduct such Severance Taxes on an ongoing basis and in the ordinary course.

36. In addition to the Severance Taxes, Merge also incurs certain expenses related to the transportation, gathering, processing and service charges (the "Gathering Fees" and together with the Royalty Obligations, NonOp WI Obligations, and Severance Taxes, the "Oil and Gas Obligations") in connection with the sale of its oil and gas production each month. Similar to the other expenses and payments deducted, the Gathering Fees are automatically deducted out of the gross amounts owed to Merge from the Gatherers. Merge seeks authority to allow the Gatherers to deduct prepetition and post-petition Gathering Fees from the amounts paid to Merge and Gogo in the ordinary course.

37. It is my belief that the payment of the Oil and Gas Obligations (including the Interest Owner Payments, Severance Taxes and Gathering Fees) is in the best interests of the Debtors' estates, its creditors and all other parties in interest. Furthermore, the payment of the Oil and Gas Obligations is necessary to maintain the Debtors' rights under the Debtors' oil and gas leases and to ensure that its operations continue on an uninterrupted basis, as the related revenues represent substantially all of the Debtors' operating income. If the Debtors are unable to pay the Oil and Gas Obligations as they come due, the Debtors' operations could be severely impacted—including the Debtors incurring penalties and interest, turnover actions, conversion, and constructive trust claims, and litigation.

38. Further, it is my understanding, that under both Texas and Oklahoma law, the Interest Owners may be entitled to assert statutory liens on the Debtors' property. The attachment of statutory liens would serve as a severe disruption to the Debtors at a time when they must focus on restructuring their business. Accordingly, on behalf of the Debtors, I respectfully request that the Court approve the relief requested in the Royalty Motion.

  **C.**  **Shared Services Motion**

  39.  As explained herein and described more fully in the *Debtors' Motion for Entry of Interim and Final Order (I) Authorizing the Debtors to Continue Their Shared Services and (II) Granting Related Relief* (the "Shared Services Motion"), the Debtors use certain non-Debtor affiliates to perform a number of tasks, including: (a) general and administrative services (the "G&A Services"), and (b) other operational services that otherwise may not be available to a company of the Debtors' size (the "Other Services," and together with the G&A Services, the "Shared Services"). The Shared Services Motion seeks entry of interim and final orders, authorizing, but not directing, the Debtors to (a) continue existing shared services arrangements with certain non-Debtor affiliates, including Gogo, Gaedeke Group and Gaedeke Energy, LLC in the ordinary course of business and granting related relief. Because the Shared Services are such an integral part of the Debtors' operations, I respectfully request that the Court approve the relief requested in the Shared Services Motion.

  **D.**  **Cash Management Motion**

  40.  The *Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Continue to Operate Their Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, (IV) Perform Intercompany Transactions, and (V) Granting Related Relief* (the "Cash Management Motion") seeks entry of interim and final orders, authorizing, but not directing, the Debtors to (a) continue to operate their Cash Management System (as defined below, (b) honor certain prepetition obligations, (c) maintain existing Business Forms (as defined below), (d) continue to perform Intercompany Transfers (as defined below) consistent with historical practice, and (e) granting related relief.

41.     The Debtors utilize a cash management system that provides well-established and efficient mechanisms for the collection, concentration, management and disbursement of funds use in their operations (the "Cash Management System"). The Debtors use the Cash Management System to (a) collect, transfer and disburse funds and (b) facilitate cash monitoring, forecasting and reporting. The Cash Management System, among other things, allows the Debtors to maintain control over their bank accounts described in the Cash Management Motion. Each of the bank accounts described in the Cash Management Motion are at Northern Mutual Trust, N.A., a UST authorized and approved depository, and two of the three accounts were opened post-petition and thus are already DIP accounts.

42.     In addition to the bank accounts, the Debtors utilize multiple electronic and physical business forms in the ordinary course of their business, including, but not limited to, letterhead and preprogrammed computer-printed checks (the "Business Forms"). To minimize expenses to the estates and avoid confusion on the part of customers, vendors, and suppliers during the pendency of the chapter 11 cases, the Debtors request that the Court authorize the continued use of all physical and electronic Business Forms in existence immediately prior to the PWR GP Petition Date, without any reference to the Debtors' status as debtors in possession. If the Debtors use all of their existing supply of printed checks during the pendency of the chapter 11 cases, the Debtors will print or order checks with the designation "Debtor in Possession" and corresponding bankruptcy case number.

43.     Finally, as explained above and in the Shared Services Motion, many of the Debtors' operations and general and administrative tasks are conducted by non-Debtor affiliates. The Debtors operations with each other and certain affiliated non-Debtor entities (the "Intercompany Transactions") has the effect of creating intercompany receivables and payables in the ordinary court of business (the "Intercompany Claims"). The Intercompany Transactions are enacted through

various methods, including direct deposits and checks, as wells as bookkeeping entries either to (a) reimburse certain of the Debtors or non-Debtors for various expenditures associated with the Debtors' businesses, (b) fund certain Debtor or non-Debtor accounts in anticipation of such expenditures, as needed, and (c) settle Intercompany Claims. In connection with the daily operation of the Cash Management System, as funds are manually moved and disbursed throughout the Cash Management System and as business is transacted between the Debtors and non-Debtor affiliates, at any given time there may be Intercompany Claims owing by one Debtor to any Debtor or non-Debtor affiliate. Even though receivables and payables may be processed or effectuated through checks, wires, ACH payments, receivables and payables to non-Debtor affiliates may be reflected as journal entry credits and debits, as applicable, in the respective Debtors' accounting systems.

### E.     Other First Day Pleadings

44.     In addition to the other First Day Pleadings described above, the Debtors are also filing concurrently herewith their: (i) *Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Admin Motion"), and (ii) *Motion for Entry of an Order (I) Authorizing the Debtors to File (A) A Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (B) A Consolidated Top 30 General Unsecured Creditor List and (II) Granting Related Relief* (the "Consolidated Matrix Motion"). The Joint Admin Motion seeks the procedural consolidation and joint administration of the chapter 11 cases pursuant to Federal Rule of Bankruptcy Procedure 1015(b) and Local Rule 1015-1. The Consolidated Matrix Motion seeks authority to file a consolidated matrix for all of the Debtors. Both motions are procedural in nature and will ease the costs of administration in these cases, and it is believed these motions are non-controversial and routinely granted in cases of these sizes.

45. Pursuant to the Joint Admin Motion, the Debtors request entry of an order directing consolidation of these chapter 11 cases for procedural purposes only. There are five (5) Debtors, and many of the parties and creditors will be the same for the Debtors. I believe that joint administration of these cases would save the Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, motions and orders. The United States Trustee for Region 3 and other parties in interest would similarly benefit from joint administration of these cases, relieving them from having to review and keep-up with pleadings in multiple cases.

46. Joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes. It does not seek substantive consolidation of the Debtors' estates. As such, I believe joint administration is in the best interests of the Debtors and their estates and the Court should grant the relief requested in the Joint Admin Motion.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge, information, and belief.

Dated: __8-11__, 2019

_____
Mark Reed
President of PWR Oil and Gas General Partners, Inc.