**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| PWR INVEST, LP, *et al.*,[1] | Case No. 19-11164 (JTD) (Jointly Administered) |
| Debtors. | **Hearing Date: October 23, 2019 at 11:00 a.m.** **Objection Deadline: October 8, 2019 at 4:00 p.m.** |

**MOTION OF CHAMBERS ENERGY MANAGEMENT, LP**
**FOR AN ORDER (I) DISMISSING THE PARENT**
**CASES OR, (II) IN THE ALTERNATIVE, GRANTING RELIEF**
**FROM THE AUTOMATIC STAY OR, (III) IN THE ALTERNATIVE, APPOINTING**
**A TRUSTEE, OR, (IV) IN THE ALTERNATIVE, TERMINATING EXCLUSIVITY**

Chambers Energy Management, LP (the "**Agent**") and Chambers Energy Capital III, LP (the "**Lender**" and together with the Agent, "**Chambers**"), by and through their undersigned counsel, respectfully submit this motion (the "**Motion**") for the entry of an order, substantially in the form attached hereto as Exhibit A-1 (the "**Proposed Order**"), (i) dismissing the Parent Cases (as defined below) or, (ii) in the alternative, granting relief from the automatic stay provided by section 362 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), for the limited purpose of allowing Chambers to exercise remedies with respect to the Borrower Equity (as defined below) and appoint a chief restructuring officer or, (iii) in the alternative, appointing a chapter 11 trustee, or, (iv) in the alternative, terminating exclusivity.  In support of this Motion, Chambers respectfully represents:

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Oklahoma Merge, LP (1308) (formerly known as Gaedeke Merge, LP), Oklahoma Merge Midstream, LP (8433) (formerly known as Gaedeke Merge Midstream, LP), Oklahoma River Basin, LP (0385) (formerly known as Gaedeke River Basin, LP), PWR Oil and Gas General Partners, Inc. (4963), and PWR Invest, LP (7429). The mailing address for the Debtors is: 3710 Rawlins St., Suite 1100, Dallas, Texas 75219, with copies to Pronske & Kathman, P.C., c/o Jason P. Kathman, 2701 Dallas Pkwy, Suite 590, Plano, Texas 75093 and Barnes & Thornburg LLP, c/o Kevin G. Collins, 1000 N. West Street, Suite 1500, Wilmington, DE 19801.

## PRELIMINARY STATEMENT

1.      In this two-party dispute between a borrower and its secured lender, the Debtors' hopelessly conflicted management has improperly used the bankruptcy process to gain negotiating leverage over the secured lender.  This Motion seeks to remedy the Debtors' improper actions and to set the parties on track toward a rational and value-maximizing resolution.

2.      Over the last four months alone, the Debtors' management has demonstrated that regardless of any contractual or fiduciary duties owed to Chambers, its unmitigated loyalty is to Sabine Gaedeke Stener, her siblings,[2] and their family's businesses (such businesses, including the Debtors, are referred to herein collectively as the "**Gaedeke Group**").  As just a few examples:

- In May 2019, on the eve of the Parent Debtors' (defined below) filing for bankruptcy, Mrs. Stener and current management arranged for Mrs. Stener to covertly step down as President and Director of Oklahoma Merge, LP (formerly Gaedeke Merge, LP) ("**Oklahoma Merge**" or the "**Borrower**") "to get her name off" the Borrower "for the benefit of companies other than Oklahoma Merge";

- On May 22, 2019, after the Borrower repeatedly defaulted on its obligations to Chambers, the Debtors' management instructed the Parent Debtors—which together hold 100% of the Borrower's equity—to file for bankruptcy for the sole purpose of preventing Chambers from exercising its contractual rights with respect to those equity interests;

- On May 31, 2019, the same day that the Borrower failed to make an interest payment due to Chambers and again defaulted on its obligations, the Debtors' management orchestrated the secret transfer of $5 million out of the Borrower's only authorized bank account for the express and admitted purpose of depriving Chambers of its rights under the Credit Agreement (defined below), even though management "understood that the withdrawal . . . was  a violation of the credit agreement";

- On June 7, 2019, management deposited that same $5 million into a new bank account that it secretly opened—acts that management admits they understood violated the Borrower's obligations under the Credit Agreement;

- Despite being in constant contact with Chambers throughout June, July, and August 2019, and knowing that they were obligated to disclose breaches of the

---

[2]      Chambers expects that discovery will show that Mrs. Stener's siblings with whom she shares an ownership in various Gaedeke Group entities, Susanne Gaedeke Gulati and Maximillian Gaedeke, have been involved in the management of the Debtors and the Gaedeke Non-Debtor Affiliates.

Credit Agreement to Chambers, management purposely and affirmatively concealed the $5 million transfer from Chambers;

- Upon learning Chambers had discovered that the $5 million was missing and intended to file a lawsuit seeking the return of that money to the authorized account, management immediately filed the Borrower's bankruptcy petition the next business day—August 12, 2019;

- The Debtors have not engaged in any post-petition plan negotiations with Chambers—and filed the Proposed Parent Plan (as defined below) solely for purposes of maintaining exclusivity, without any negotiation of the terms with Chambers—and are holding out with the apparent desire of pursuing a "new value" plan to preserve equity for the Gaedeke family and leave Chambers impaired; and

- The Debtors are risking the value of their businesses to obtain leverage over Chambers, including at the first day hearing when they preferred to forgo approval of the use of cash collateral rather than agree to terms for adequate protection or risk a ruling on the issue.

3.    In light of these undisputed facts, the only logical explanation for management's decision to forge ahead with these Chapter 11 Cases (as defined below), as potential administrative insolvency looms, is that management is willing to gamble the Debtors' remaining value—and to deprive Chambers of any meaningful recovery—as long as it is in the interests of equity (specifically Mrs. Gaedeke Stener, Mrs. Gaedeke Gulati, and Mr. Gaedeke).  These are not valid purposes for chapter 11 cases.  Rather, the Court should grant relief to permit the tools available in chapter 11 to be applied for all of the Debtors' stakeholders and not for the exclusive benefit of the Debtors' insiders.

4.    The first step in remedying the Debtors' actions is to dismiss the Parent Cases for cause pursuant to section 1112 of the Bankruptcy Code.  The Debtors' value-destructive filing of the Parent Debtors' bankruptcy petitions was done solely to prevent Chambers from exercising its rights with respect to the Borrower's Equity (defined below).  The Parent Cases amount to a two-party dispute that does not belong in bankruptcy.  Dismissal of the Parent Cases will allow Chambers to exercise remedies with respect to the Borrower Equity and appoint a chief

restructuring officer to manage the Debtors' businesses and these Chapter 11 Cases in a manner consistent with the Debtors' fiduciary duties. The Proposed Parent Plan (as defined below) appears to recognize that the Borrower Equity will inevitably be controlled by Chambers, but the Debtors have done everything they can to delay that inevitability. The Proposed Parent Plan was filed without prior negotiation with Chambers and is nothing more than a procedural maneuver to extend the Debtors' exclusivity period without seeking relief from the Court. The Debtors' lack of good faith behind the filing of the Proposed Parent Plan is evidenced by their continued refusal to reveal their plan proposal for the other Debtors (which would be transferred to Chambers under the Proposed Parent Plan) and by their failure to move for approval of the Proposed Parent Disclosure Statement (as defined below) and solicitation procedures.

5.      Alternatively, if the Court declines to dismiss the Parent Cases, the automatic stay should be lifted for the limited purpose of permitting Chambers to exercise remedies with respect to the Borrower Equity and appoint a chief restructuring officer. Cause exists to lift the stay, including because Chambers' interest in its collateral is not adequately protected. Indeed, the Debtors' own schedules and budget demonstrate it is not possible for adequate protection to be provided, as the Debtors are rapidly approaching administrative insolvency, have pledged substantially all of their assets to Chambers, and have no additional assets of value.[3]

6.      In the event that the Court does not dismiss the Parent Cases or lift the stay, the Court should appoint a chapter 11 trustee. The Debtors' management has demonstrated that they are either unable or unwilling to honor their fiduciary and contractual duties to Chambers. Chambers has barely started to take discovery (which was limited to the cash collateral dispute),

---

[3]      To the extent that the court dismisses the Parent Cases, Chambers requests that the court grant such additional relief—such as prohibiting any asset transfers by the Parent Debtors—as may be necessary to ensure that Chambers' interests are protected throughout the process of appointing a chief restructuring officer.

and the record already speaks volumes.[4]  By the Debtors' President's own admission, management has *knowingly and purposely* violated its duties to Chambers for the benefit of the Gaedeke family. Put simply, Chambers justifiably cannot trust management to abide by their duties during the pendency of these Chapter 11 Cases.  It is precisely under these circumstances that courts appoint a trustee, and a trustee should be appointed here.

7.      Finally, in the event the Court finds that none of the above relief is justified, the Court should terminate the Debtors' exclusivity period to allow Chambers to file a plan without further harm to the estates from costly delay in progress towards a resolution of these Chapter 11 Cases.  The Debtors have shown no progress toward a reorganization, and have adamantly opposed a sale process, which is the only rational consensual path available in these Chapter 11 Cases. Terminating exclusivity would help ensure a fair and equitable resolution by permitting Chambers to propose a plan, consistent with the terms of the plan term sheet attached hereto as <u>Exhibit A-2</u>, that leaves trade creditors unimpaired, provides for Chambers to acquire its collateral, and allows a complete investigation and prosecution of the valuable claims of the Debtors' estates against their insiders.

## **JURISDICTION AND VENUE**

8.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware* dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and, under Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

---

[4]      Chambers has only taken one deposition for *two* hours—Mr. Reed's, in his personal capacity—and intends to supplement the record with discovery obtained after the filing of this Motion and in anticipation of a hearing.

Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicate for the relief requested herein are sections 362, 1104, 1112, and 1121 of the Bankruptcy Code.  In accordance with Local Rule 9013-1(f), Chambers consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

### I.    The Term Loan Facility And The Collateral

9.    Prior to the Petition Dates (as defined below), Chambers and certain banks and other financial institutions financed a term loan facility (the "**Term Loan Facility**") to the Borrower pursuant to that certain Credit Agreement among the Borrower, the lenders from time to time party thereto, and the Agent, dated as of December 22, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), a copy of which is attached hereto as Exhibit B.  As of the Subsidiary Petition Date (as defined below), approximately $74,238,286.84 of principal was outstanding under the Term Loan Facility along with accrued and unpaid interest of not less than $3,919,627.78 (plus any additional obligations under the Credit Agreement), for an aggregate prepetition claim of not less than $78,157,914.61. *See Interim Order under 11 U.S.C. §§105(a), 361, 362, 363, and 552, Fed. R. Bankr. P. 4001(b) and Del. Bankr. L.R. 4001-2 (a) Authorizing Use of Cash Collateral and (b) Granting Adequate Protection* [Docket No. 103] (the "**Interim Cash Collateral Order**"), para. D(iii).

10.    The Term Loan Facility is secured by substantially all assets of the Borrower (the "**Borrower Collateral**") pursuant to that certain Guarantee and Security Agreement, dated as of December 22, 2017, made by Borrower and the other Grantors party thereto in favor of Chambers, as agent (as amended, amended and restated, supplemented or otherwise modified from time to

time, the "**Security Agreement**"), a copy of which is attached hereto as <u>Exhibit C</u>. *See Declaration of Mark Reed in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 39] (the "**Reed Declaration**"), para. 13; *Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Use of Cash Collateral, (ii) Granting Adequate Protection to the Secured Parties, (iii) Scheduling a Final Hearing, and (iv) Granting Related Relief* [Docket No. 45] (the "**Cash Collateral Motion**"), para. 11; *Objection and Reservation of Rights of the Prepetition First Lien Secured Parties with Respect to the Debtors' Proposed Use of Cash Collateral* [Docket No. 57] (the "**Cash Collateral Objection**"), para. 4.; Interim Cash Collateral Order, para. D(ii).

11.     Debtor Oklahoma River Basin, LP pledged all of its leasehold and mineral interests (the "**River Basin Collateral**") to secure the Borrower's payment of the obligations under the Credit Agreement. *See* Reed Decl., para. 13; Cash Collateral Motion, para. 11; Cash Collateral Objection, para. 4.

12.     Debtor PWR Oil and Gas General Partners, Inc. is the general partner (the "**General Partner**") of the Borrower and is the legal and beneficial owner of 0.01% of the capital stock of the Borrower (the "**GP Held Equity**").  Debtor PWR Invest, LP (the "**Limited Partner**" and, together with the General Partner, the "**Parents**" or the "**Parent Debtors**") is the limited partner of the Borrower and is the legal and beneficial owner of 99.99% of the capital stock of the Borrower (the "**LP Held Equity**" and together with the GP Held Equity, the "**Borrower Equity**," and the Borrower Equity together with the Borrower Collateral and the River Basin Collateral, the "**Collateral**").

13.     Pursuant to Section 4.1(b) to the Credit Agreement, the Parents entered into that certain Pledge Agreement, a copy of which is attached hereto as <u>Exhibit D-1</u> (the "**Borrower Equity Pledge Agreement**"), among the Parents, as Pledgors, and the Agent, dated as of

December 22, 2017, whereby the Parents pledged their respective Borrower Equity to the Agent, on behalf of the lenders under the Term Loan Facility, as collateral to secure the Term Loan Facility.  In addition, the Parents entered into that certain Pledge Agreement, a copy of which is attached hereto as Exhibit D-2 (the "**Merge Midstream Equity Pledge Agreement**" and, together with the Borrower Equity Pledge Agreement, the "**Pledge Agreements**" and, the Pledge Agreements together with the Security Agreement, the "**Security Documents**"), among the Parents, as Pledgors, and the Agent, dated as of April 25, 2018, whereby the Parents pledged their respective equity in Debtor Oklahoma Merge Midstream, LP  (formerly known as Gaedeke Merge Midstream, LP) to the Agent, on behalf of the lenders under the Term Loan Facility, as collateral to secure the Term Loan Facility.

## II.    The Borrower Defaulted Repeatedly In 2018 And 2019

14.    The Borrower breached its financial covenants as of December 31, 2018 and March 31, 2019.  *See* Exhibit E (First Day Hr'g Tr.) at 63:6-10.  The Borrower subsequently informed Chambers that it anticipated breaching the June 30, 2019 and September 30, 2019 financial covenants.  *Id.* at 63:15-19.  Since then, multiple Events of Default (as defined in the Credit Agreement)—including a failure by the Borrower to pay interest when due and payable—have occurred and are continuing under the Credit Agreement.

15.    On July 25, 2019, Chambers sent the Notice of Acceleration and Reservation of Rights attached hereto as Exhibit F (the "**Notice of Acceleration**") to the Borrower.

## III.    The Debtors Are Intertwined With Their Non-Debtor Affiliates And The Debtors' Management Is Beholden To Mrs. Stener And Her Siblings

16.    The Debtors' business is conducted by non-Debtor affiliates, including Gaedeke Oil and Gas Operating, LLC ("**Gogo**"), Gaedeke Group, LLC, and Gaedeke Energy, LLC (collectively, the "**Gaedeke Non-Debtor Affiliates**").  *See* Reed Decl., para. 9.  Importantly, the

Debtors' President, Mark Reed, testified at the first day hearing held on August 15, 2019 (the "**First Day Hearing**") that the Debtors and the Gaedeke Non-Debtor Affiliates share the same management, and are ultimately owned by the Gaedeke family.  First Day Hr'g Tr. 48:16-49:18.

17.     Specifically, Mrs. Stener (formerly Gaedeke) is the member of the Gaedeke family who, as CEO of various entities within the Gaedeke Group, runs both the United States-based Gaedeke real estate entities and the Gaedeke energy entities (including the Debtors and the Gaedeke Non-Debtor Affiliates).  *See* Exhibit G (Gaedeke Leadership Website); Exhibit H (Mark Reed Deposition Transcript (Reed Dep.)) at 26:5-11.  Mr. Reed, who has known the Gaedeke family for 24 years and is personal friends with Mrs. Stener, is a Director and President of all of the Debtors, as well as the President of affiliates Gogo, Gaedeke Energy, and Gaedeke Gas Gathering.  Reed Dep. 9:11-16, 17:24-19:8, 25:11-15; First Day Hr'g Tr. 49:4-16.  Mr. Reed receives his paycheck from Gaedeke Group, not from the Debtors.  Reed Dep. 19:9-23.  Glenn Lickstein, who has known the Gaedeke family for 26 years, serves as a Director and Vice President of all five Debtors, and is also the President of Gaedeke Group.  *See* Gaedeke Leadership Website; First Day Hr'g Tr. 49:15-18.

18.     The Debtors are completely intertwined with the Gaedeke Non-Debtor Affiliates (and specifically Mrs. Gaedeke Stener, Mrs. Gaedeke Gulati, and Mr. Gaedeke), resulting in pervasive conflicts of interest, as evidenced in part by an absolute failure to follow standard corporate formalities.  Indeed, Mr. Reed testified that *none* of the Debtors nor the Gaedeke Non-Debtor Affiliates has ever held a board meeting or recorded board minutes.  *See* Reed Dep. 27:3-10.  When a decision needs to be made for a Gaedeke entity, Mrs. Stener and management exercise their control over *all* of the Gaedeke entities to decide the path that best meets their interests.  For example, Mr. Reed testified that he, Mrs. Stener, Mr. Lickstein, and the general counsel met in

2018 and 2019 to make an "internal decision of which [Gaedeke] entity had the cash available" to make $8 million and $4 million contributions to the Borrower.  *Id*. at 71:16-72:18; Reed Decl., para. 19; First Day Hr'g Tr. 71:5-10.  Mr. Reed testified that these same people decided to structure the $4 million contribution as a loan bearing a two-percent interest rate without conducting any negotiations because "[t]hat is the way we wanted to do it."  Reed Dep. 76:18-77:12.

19.    Importantly, the decisions made by Mrs. Stener and the Debtors' current management were not always for the benefit of the Debtors.  Despite there being purportedly no concerns about the way in which Mrs. Stener was running the Borrower, in May 2019—while the Debtors considered filing for bankruptcy, Mr. Reed replaced Mrs. Stener as President and Director of the Borrower "[b]ecause we were thinking about Bankruptcy at the time, and we wanted to get [Mrs. Stener's] name off it."  *Id*. at 12:12-13:20, 15:1-6.  Mr. Reed admitted that the transition from Mrs. Stener to Mr. Reed as Director of the Borrower was done "for the benefit of companies *other than Oklahoma Merge*."  *Id*. at 13:17-20 (emphasis added).  Today, Mrs. Stener allegedly holds an unpaid "advisory role" for the Borrower, although that purported arrangement is not memorialized in any agreement.  *Id*. at 15:13-22.  Mrs. Stener's siblings, Mrs. Gaedeke Gulati and Mr. Gaedeke, have also served in leadership (and/or ownership) roles within the Gaedeke Group.

20.    These deep-rooted conflicts and failures to follow corporate formalities have affected how the Debtors and Gaedeke Non-Debtor Affiliates conduct business.  By way of example, Gogo provides services to the Borrower pursuant to a Management Agreement dated as of February 23, 2017 (as amended, supplemented, or modified from time to time, the "**Management Agreement**"), a copy of which is attached here as Exhibit I.  *See* Reed Decl., para. 9.  The Management Agreement provides for a fee to be charged by Gogo to the Borrower of five

and one-half percent (5.5%) of monthly total revenues.  However, Mr. Reed admitted that there were no negotiations regarding that fee; that the amount was simply decided "internally" by him and Mrs. Stener; that there was no agreement in place between Gogo and the Borrower for *years* before the Management Agreement was signed; that neither he nor Mrs. Stener conducted a market test to determine whether that fee was reasonable; that no fairness opinion was ever done regarding the fee; and that Mr. Reed signed the Management Agreement on behalf of both Gogo and the Borrower.  First Day Hr'g Tr. 55:23-59:20.

21.    As another example, Mr. Reed, along with Debtors' counsel and Mrs. Stener, decided that Gogo would, *for the first time ever*, "prepay" over a million dollars of revenue to the Borrower on the eve of bankruptcy, in May and July 2019.  This prepayment would allow the Debtors to argue to this Court (as they did) that future revenues Gogo received on account of the Debtors' assets should not constitute cash collateral in an apparent effort to "launder" the Debtors' pledged receivables into something that did not constitute cash collateral.  There are no documents that memorialize Gogo's decision to prepay the Borrower or the Borrower's decision to accept these funds.  Reed Dep. 49:9-51:15.  The Debtors have now conceded the proceeds of the alleged "prepayment" and the Debtors' pledged receivables are Chambers' cash collateral only in the face of a scheduling hearing to adjudicate the validity of Chambers' liens on such cash.  *See Second Interim Order under 11 U.S.C §§ 105(a), 361, 362, 363, and 552, Fed. R. Bankr. P. 4001(b) and Del. Bankr. L.R. 4001-2 (A) Authorizing Use of Cash Collateral and (B) Granting Adequate Protection* [Docket No. 139], ¶ 5(iv).  Despite this concession, it remains unclear whether Gogo recovered any funds from the Debtors in satisfaction of the alleged "prepayment" transaction prior to the Subsidiary Petition Date (as defined below) and what claims Gogo may seek to assert against the Debtors arising from the alleged transaction.

22.     Finally, the Gaedeke entities' failure to distinguish between the various entities in the Gaedeke empire has directly impacted these Chapter 11 Cases.[5]  As the Court is aware, Gogo was collecting revenues from various sources and commingling them into one bank account, making it difficult to determine which funds were attributable to the Debtors and thus constituted Chambers' collateral.  This practice continued even after Debtors' chapter 11 petitions were filed.[6]

## IV.     The Parent Debtors' Chapter 11 Cases

23.     Throughout April and May 2019 (and through August 2019), Chambers attempted to engage the Debtors in good-faith negotiations regarding a comprehensive restructuring of the Term Loan Facility and the use of Cash Collateral that would make financing available to the Borrower to complete certain properties in Oklahoma[7] and maximize the value of the Collateral. Chambers' efforts to negotiate such a restructuring, however, have been thwarted by management's unrelenting loyalty to Mrs. Stener and their commitment to hold out for grossly outsized value for the Gaedeke family.

24.     On May 22 and May 23, 2019 (the "**Parent Petition Dates**"), the Parent Debtors commenced their chapter 11 cases (the "**Parent Cases**"), thereby availing themselves of the protections of the automatic stay and preventing Chambers from exercising remedies with respect to the Borrower Equity pledged by the Parent Debtors.  First Day Hr'g Tr., 10:10-21.

25.     On June 28, 2019, each of the Parent Debtors filed its schedules of assets and liabilities [Case No. 19-11161, Docket No. 24; Case No. 19-11164, Docket No. 23] (the

---

[5]     The overlap between the Debtors, the Gaedeke entities, and Mrs. Stener is so prominent that a court may find that non-Debtor Gaedeke entities and Mrs. Stener individually are liable for the amount owed to Chambers under an alter ego theory.

[6]     Debtors have since agreed that Gogo would cease comingling the Debtors' revenues with the revenues of non-Debtors in return for Chambers' consent to the use of its cash collateral.

[7]     The Debtors must complete these wells or the leases will be revert back to the property owners.

"**Schedules**").   The General Partner's Schedules list cash ($155.40) and non-publicly traded ownership interests (0.01% interests in the Borrower, Oklahoma River Basin, LP, and Oklahoma Merge Midstream, LP) as the General Partner's only assets.  The General Partner's Schedules list no liabilities, and list the Agent as the General Partner's only creditor, secured or unsecured.

26.    The Limited Partner's Schedules list cash ($178,311.55), non-publicly traded ownership interests (99.9% interests in the Borrower, Oklahoma River Basin, LP, and Oklahoma Merge Midstream, LP), and a hedging agreement with JPMorgan Chase Bank, N.A. ("**JPMorgan**") (which is also listed as a liability) as the Limited Partner's only assets.  The Limited Partner's Schedules list the Agent as the only secured creditor, with Gaedeke Holdings II Ltd. listed as an unsecured creditor on account of a subordinated intercompany loan,[8] and JPMorgan listed as an unsecured creditor on account of the hedging agreement which is also listed as an asset. A copy of the Subordinated Amended and Restated Demand Promissory Note by and between the Borrower and Gaedeke Holdings VII Ltd. is attached hereto as Exhibit J (the "**Subordinated Note**").  Neither Parent is a party to the Subordinated Note.  The Subordinated Note was signed by Mr. Reed on behalf of both the Borrower and Gaedeke Holdings VII Ltd.  Ex. J; *see also* First Day Hr'g Tr. 73:14-17.

27.    Neither Parent listed a single creditor on its *List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders*.  Case No. 19-11161, Docket No. 3; Case No. 19-11164, Docket No. 3.

28.    On July 25, 2019, each Parent Debtor filed a *Periodic Report Regarding Value, Operations and Profitability of Entities in Which the Debtors' Estates Hold a Substantial or*

---

[8]    Chambers understands that Gaedeke Group owns or controls all of the equity or partnership interests in Gaedeke Holdings II Ltd.

*Controlling Interest* [Case No. 19-11161, Docket No. 37; Case No. 19-11164, Docket No. 36] (the

"**Periodic Reports**"), as required by Rule 2015.3 of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**").  Each of the Periodic Reports includes an unaudited balance sheet for

the Borrower, as of April 30, 2019, which shows assets of approximately $39.7 million and

liabilities of approximately $93.3 million, implying that the Parent Debtors have no equity value

in the Subsidiary Debtors.

29.     On September 19, 2019, the Parent Debtors filed a proposed plan of reorganization

[Docket No. 142] (the "**Proposed Parent Plan**") and accompanying disclosure statement [Docket

No. 143] (the "**Proposed Parent Disclosure Statement**").  As of the date hereof, the Debtors have

not sought any relief from the Court with respect to the Proposed Parent Plan or the Proposed

Parent Disclosure Statement.

**V.     Debtors' Management Secretly Transferred Funds From The Sole Authorized
        Account To An Unauthorized Account In Violation Of The Credit Agreement**

30.     Pursuant to the Credit Agreement, the Borrower was authorized to maintain only

one account—a Bank of Texas account—and was required to keep all of the Borrower's money in

only that account.  The Bank of Texas account was subject to a deposit control agreement with

Chambers.  First Day Hr'g Tr. 67:3-9.

31.     Nonetheless, on May 31, 2019—the same day that the Borrower failed to make an

interest payment due under the Credit Agreement—the Borrower withdrew $5 million, which was

substantially all of its cash, from its bank account via a cashier's check.  *Id.* at 68:25-69:20.  Mr.

Reed admitted that he instructed the secret withdrawal of the $5 million even though he understood

that it violated the Credit Agreement, and that he purposely kept the transfer a secret from

Chambers for months even though he understood that he was obligated to disclose the breach.  *Id.*

at 67:18-21, 70:13-21, 71:2-3, 72:7-18.  Unlike all other withdrawals, this withdrawal was made

using an unsigned and handwritten teller slip that merely stated the $5 million was debited "per ASR request." *Id.* at 69:8-10. The Borrower then secretly opened a Northern Trust bank account and deposited the $5 million into that account, again with knowledge that such actions violated the Credit Agreement. *Id.* at 69:25-71:12; *see also* <u>Exhibit K</u> (PWR DEBTORS_00009). Mr. Reed admitted that the secret transfer was done to hinder Chambers' ability to exercise its rights as to that money. First Day Hr'g Tr. 70:3-71:3.

32. On August 9, 2019, after Chambers discovered that the Borrower had orchestrated a secret withdrawal of nearly all of the money in the Bank of Texas account, Chambers wrote to the Debtors demanding an immediate return of the funds to the authorized account. Debtors' counsel responded that the money was placed in a new bank account to protect the interests of "all of its creditors." <u>Exhibit L</u> (August 9, 2019 E-mail from Gerrit Pronske to Bryce Kaufman). Notably, the Borrower's petition shows that the two largest unsecured creditors are Gaedeke entities. Case No. 19-11808, Docket No. 1.[9]

33. Sometime over the weekend of August 10 and 11, 2019, the Debtors were tipped off that Chambers intended to seek a temporary restraining order that would require the Borrower to return the $5 million to the authorized account. First Day Hr'g Tr. 11:4-12. Instead of returning the money, or engaging in negotiations with Chambers, the Debtors filed for bankruptcy the next business day—Monday, August 12, 2019.

## VI.  Oklahoma Merge's Chapter 11 Cases

34. On August 12, 2019 (the "**Subsidiary Petition Date**" and, together with the Parent Petition Dates, the "**Petition Dates**"), Oklahoma Merge, LP, Oklahoma Merge Midstream, LP,

---

[9]    Further, armed with the insider knowledge that the Debtors were about to file for bankruptcy, Gogo prepaid revenues to Oklahoma Merge in May and July 2019.

and Oklahoma River Basin, LP (the "**Subsidiary Debtors**") filed chapter 11 petitions with this Court (the "**Subsidiary Cases**" and, together with the Parent Cases, the "**Chapter 11 Cases**").

35.     According to the Debtors' petitions, aside from Chambers, the Debtors' known creditors consist of an insider subordinated lender, an insider management services provider, and trade creditors with prepetition unsecured claims in an aggregate known amount of $775,436.24— at least some of which has since been paid or is expected to be paid pursuant to relief granted by the Court.  *See* Chapter 11 Petitions of Oklahoma Merge, LP (formerly known as Gaedeke Merge, LP), Case No. 19-11808, Docket No. 1, Oklahoma Merge Midstream, LP (formerly known as Gaedeke Merge Midstream, LP), Case No. 19-11809, Docket No. 1, Oklahoma River Basin, LP (formerly known as Gaedeke River Basin, LP), Case No. 19-11811, Docket No. 1, PWR Oil and Gas General Partners, Inc., Case No. 19-11161, Docket No. 1, and PWR Invest, LP, Case No. 19-11164, Docket No. 1.

36.     In sum, based on the Debtors' own filings and admissions:

- The Agent is the only secured creditor of either Parent;

- The Agent is the only creditor—secured or unsecured—of the General Partner;

- There is only one potential non-affiliate creditor of the Limited Partner other than the Agent, and any claims of that creditor are contingent and unliquidated;

- The Parent Debtors have zero equity value in the Borrower;[10] and

- The Agent is the only non-affiliate secured creditor of any of the Debtors.

## VII.    <u>Diminution In The Value Of The Collateral</u>

37.     The Debtors' current cash budget shows that during the 13-week term of the budget, the Debtors expect their cash balance to decrease by $3,935,892 (consisting of $829,958 of

---

[10]     By this Motion, Chambers makes no assertions as to the value of the Borrower Equity, and reserves all rights with respect thereto.

Operating & NonOp Disbursements, $2,341,759 of CapEx expenditures, and $764,175 for the Debtors' professional fees).  *See* <u>Exhibit M</u> (Oklahoma Merge 13-Week Cash Flow Forecast). This diminution in the value of the Secured Parties' cash collateral (the "**Cash Collateral**") over the 13-week budget period is in addition to the $1,716,380 (consisting of $1,716,182 of CapEx expenditures and $198 of Operating & NonOp Disbursements) that the Debtors have already burned through the week ending September 13, 2019, for total projected expenditure of cash collateral of $5,652,272 by the conclusion of the Debtors' current budget.  *See id.*; *see also* <u>Exhibit N</u> (Variance Reports).   Meanwhile, as the Debtors burn through the Secured Parties' cash collateral, the Debtors' receipts are falling well short of expectations, as each variance report provided by the Debtors has negative variance of greater than 50% with respect to total receipts. *See* Exhibit N.

38.     This significant diminution in cash would be even worse if the Debtors had maintained their own projections from the initial budget, filed August 12, 2019.  Docket No. 45-2.  That 13-week cash flow forecast showed Debtors' cash decreasing from $5,974,053 as of the Subsidiary Petition Date to a mere $736,609 at the end of the 13-week period.  Since then, the Debtors have made three significant changes to the forecast that have artificially improved the Debtors' cash position.  <u>First</u>, the Debtors reduced, without explanation, their projected capital expenditures for non-operated wells.  Those expenses had been projected to be between $114,000 and $142,500 per week in the August 12 projection, and are now down to only $67,714 per week in the September 13 projection—an approximately $1 million change over the course of 13 weeks. These revised projections are inconsistent with the Debtors' historical 12-month run rate for non-operated capital expenditures of $648,599 per month.  <u>Second</u>, the Debtors have conceded that approximately $569,000 in payments from Gogo to the Borrower constitute Chambers' cash

collateral.  Docket No. 139.  And <u>third</u>, capital expenditures to complete the Burchfield Trust Well—which were initially projected to be $3.75 million—have been revised down to $3.25 million.

39.     The risk remains that the Debtors' expenses will far exceed these adjusted projections.  For example, if the operator for a non-Debtor-operated well requests that the Debtors participate in the costs associated with that well, the Debtors' failure to participate could result in the loss of the Debtors' interest in the well or significant penalties.

## VIII.   <u>Post-Petition Mismanagement</u>

40.     In addition to forsaking their fiduciary duties to the Borrower's secured lender, management has demonstrated since the Debtors filed for bankruptcy that it cannot be trusted to effectively run the businesses.

41.     By way of example, on August 23, 2019, the Debtors (through their financial advisor) requested that Chambers approve a well proposal *that same day* or risk missing out on the opportunity.  Worse, the Debtors had received the proposal in *February*, but waited until the last possible day to seek Chambers' approval for payment out of the cash collateral.  Regardless of the ultimate performance of the investment, the Debtors' last-second demand was a failure of management.  *See* <u>Exhibit O</u> (February 7, 2019 Letter Seeking Gaedeke Participation).

42.     Likewise, on September 9, 2019, the Debtors (again through their advisor) made a request for immediate approval of a prepayment of approx. $2.1M for work on the Burchfield well, which was scheduled to start the next day.  Chambers once again was forced to respond to a multi-million dollar request with only a day's notice, even though the Burchfield project had been contemplated for months.

43.     The Debtors' mismanagement is further evidenced by the Debtors' variance reports, which show that the Debtors have received less than half of the receipts that they have

projected in their budgets, and have made virtually no expenditures other than capital expenditures, which calls into question the Debtors' payment of post-petition obligations. *See* Exhibit N (Variance Reports).

## IX.   The Debtors' Claims Against Insiders And Affiliates

44.   The Debtors and their estates hold an array of potential claims against their insiders and affiliates arising from the pre- and post-petition actions of management, as well as the irrefutably intertwined relationship among management, the Debtors, the non-Debtor affiliates, other Gaedeke entities, Mrs. Stener, Mrs. Gaedeke Gulati, and Mr. Gaedeke.  These potential claims include, among others:

- **Fraudulent Transfer.**  After the Borrower was clearly insolvent, the Borrower continued to make significant payments to Gogo based on a 5.5 percent management fee that was never negotiated; was never subject to a market test; and was never the subject of a fairness opinion.  Further, while Mr. Reed's salary is currently unknown because he refused to disclose his salary at his deposition, to the extent that it is excessive, that too may constitute a fraudulent transfer.

- **Insider Preference.**  The Debtors still have not filed their schedules and statements, leaving open the possibility that the estates hold valuable preference claims for payments received by the Gaedeke Non-Debtor Affiliates and/or Mrs. Stener and/or her siblings in the year prior to the petition dates.

- **Breach of Fiduciary Duty.**  The Debtors' directors and officers have repeatedly abandoned their fiduciary duties for the benefit of Mrs. Stener and her siblings' businesses, including by taking actions that Mr. Reed admitted were for the benefit of companies *other than* the Borrower as well as actions that were intended to be to the detriment of the Borrower's secured lender on the eve of bankruptcy.

- **Aiding and Abetting Breach of Fiduciary Duty.**  The Gaedeke Non-Debtor Affiliates were often the beneficiaries of the Debtors' officers and directors' disloyalty.  Because the Debtors and the Gaedeke Non-Debtor Affiliates share the same management team, the Gaedeke Non-Debtor Affiliates are also liable for any such unlawful conduct by the Debtors' directors and officers.

- **Alter Ego and Successor Liability.**  The evidence has already demonstrated that the Gaedeke Non-Debtor Affiliates, as well as Mrs. Stener and her siblings, are inextricably intertwined with the Debtors, as *none* of the entities has ever followed corporate formalities and management is charged with running *all* of the entities.  As a result,

liabilities of the Debtors are liabilities of their Non-Debtor Affiliates and, under certain circumstances, such claims may constitute property of the estate.

45.     The facts demonstrate that management cannot be trusted to pursue any actions the Debtors have against Mrs. Stener, her siblings, or their Gaedeke entities, and the pervasive conflicts in interest prevent management from pursuing any actions the Debtors have against affiliates and insiders.

46.     Under these circumstances, management simply cannot be trusted to fulfill their fiduciary (or contractual) duties to creditors to maximize the value of the estates.

## RELIEF REQUESTED

47.     By this Motion, Chambers seeks entry of the Proposed Order: (i) dismissing the Parent Cases pursuant to section 1112 of the Bankruptcy Code, or, (ii) in the alternative, granting relief from the automatic stay pursuant to section 362(d)(1) and (d)(2) of the Bankruptcy Code to allow Chambers to exercise remedies with respect to the Borrower Equity for the purpose of appointing a chief restructuring officer, or, (iii) in the alternative, appointing a chapter 11 trustee, or, (iv) in the alternative, terminating exclusivity.

## BASIS FOR RELIEF REQUESTED

### I.     The Parent Cases Should Be Dismissed For Cause Because They Were Not Filed In Good Faith

48.     The Court should dismiss the Parent Cases for cause because the Debtors cannot show that they were filed in good faith.  *See In re Integrated Telecom Express, Inc*., 384 F.3d 108, 118 (3d Cir. 2004) ("the burden is on the bankruptcy petitioner to establish [good faith]."); *see also In re 15375 Memorial Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir.2009) (same); *In re SGL Carbon Corp.*, 200 F.3d 154, 162 n.10 (3rd Cir. 1999) (same); *In re Tamecki*, 229 F.3d 205, 207 (3d Cir.2000) (same).  Section 1112(b)(1) of the Bankruptcy Code provides:

[O]n request of a party in interest, and after notice and a hearing, the court shall dismiss a case under this chapter, whichever is in the best interest of creditors . . . and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

49.    Once "cause" has been found, the Court has limited discretion to decline to dismiss or convert a chapter 11 case.  *See In re Midwest Properties of Shawano, LLC*, 442 B.R. 278, 283 (Bankr. D. Del. 2010) (stating that pursuant to BAPCPA, "[t]he statutory language has been changed from the permissive ("a court 'may' convert or dismiss a case) to mandatory (a court 'shall' convert or dismiss a case)") (citations omitted).

50.    Courts find "cause" to dismiss a chapter 11 case where the debtors fail to satisfy the good-faith requirement for filing a chapter 11 case, because "the absence of good faith constitutes 'cause' to dismiss a Chapter 11 petition under § 1112(b)."  *In re SGL Carbon Corp.*, 200 F.3d at 160; *see also In re HBA East, Inc.*, 87 B.R. 248, 258 (Bankr. E.D.N.Y. 1988) (a court may "dismiss a Chapter 11 case for any reason cognizable to the equity power and conscience of the court as constituting an abuse of the bankruptcy reorganization process").  To determine whether a bankruptcy case was filed in good faith, a court must make a "fact intensive inquiry" and "examine the totality of facts and circumstances to determine whether support a finding of good faith."  *In re SGL Carbon Corp.*, 200 F.3d at 162.

51.    The Third Circuit has identified two factors for evaluating a debtor's good faith: (i) whether the petition serves a valid bankruptcy purpose; and (ii) whether the petition was filed to obtain a tactical litigation advantage.  *See id*. at 165. A petition serves a valid bankruptcy purpose only when "it serves a valid reorganizational purpose."  *Id*.  In contrast, "if a petitioner has no need to rehabilitate or reorganize, its petition cannot serve the rehabilitative purpose for which Chapter 11 was designed."  *Id*. at 166.  Importantly, the "filing of a bankruptcy petition as a litigation tactic,

or to resolve what is essentially a two-party dispute, is an indication of a bad faith filing." *In re Business Information Co., Inc*., 81 B.R. 382, 385 (Bankr. W.D. Penn. 1988).

52.     As part of its fact-specific inquiry, "courts typically review the record for evidence of various factors: a. Single asset case; b. Few unsecured creditors; c. No ongoing business or employees; d. Petition filed on eve of foreclosure; e. Two party dispute which can be resolved in pending state court action; f. No cash or income... j. No possibility of reorganization; ... l. Debtor filed solely to create automatic stay; and m. Subjective intent of the debtor." *In re Primestone Inv. Partners, L.P*., 272 B.R. 554, 557 (Bankr. D. Del. 2002).  Here, the Debtors cannot come close to satisfying their burden of showing the Parent Cases were filed in good faith.

53.     ***First***, Debtors' counsel admitted that these Chapter 11 Cases were filed for a single purpose:  to gain a tactical advantage by preventing Chambers from foreclosing on the Collateral. At the First Day Hearing, Debtors' counsel represented that "there was a concern that the lender could essentially foreclose or exercise their control rights over the subsidiaries . . . [s]o we filed the two parent companies[.]"  First Day Hr'g Tr. 10:10-17.  As a matter of law, this is not a valid reorganization purpose.  *See In re Derma Pen,* LLC, 2014 WL 7269762 (Bankr. D. Del. 2014 (dismissing chapter 11 case that was filed as a litigation tactic); *In re Phoenix Piccadilly*, 849 F.2d 1393, 1394 (11th Cir. 1988) ("the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or ... factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights'") (citations omitted); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986) (instructing bankruptcy courts to consider "the debtor's financial condition, motives, and the local financial realities").

54.     Similar to the circumstances here, in *Phoenix Piccadilly*, the debtor wanted "to fight [the creditor's] foreclosure action" and "to make whatever legal defenses are appropriate to forestall [the creditor's] actions, including . . . the filing of a Chapter 11 Bankruptcy Petition." *Phoenix Piccadilly*, 849 F.2d at 1395. The court found that the bankruptcy filing was in bad faith and affirmed the bankruptcy court's dismissal of the case. *Id.* The Debtors here have admitted that the sole purpose of filing the Parent Cases was to prevent Chambers from foreclosing on the Borrower Equity. The Debtors cannot use the automatic stay as a tool to frustrate Chambers— their only secured creditor—from exercising its legal rights.

55.     **Second**, the record shows that there is no other valid bankruptcy purpose for the filing of these Parent Cases. Notably, the Debtors have not engaged in any meaningful negotiations with Chambers—their sole secured creditor—towards a potential chapter 11 plan, and have failed to propose any alternative way for these Chapter 11 Cases to move forward.[11] They have provided no viable proposals to Chambers, and they have no proposals from any other party for new financing. Indeed, in the three months that passed from the filing of the Parent Cases to the Subsidiary Petition Date, activity in these Chapter 11 Cases was minimal. The Debtors have not cited, and cannot cite, a legitimate reason for the filing of the Parent Cases.

56.     Even the filing of the Proposed Parent Plan does not provide insight as to any valid bankruptcy purpose for the filing of the Parent Cases. It is clear that the filing of the Proposed Parent Plan is merely a procedural maneuver to extend the Parent Debtors' Exclusive Periods (as defined below) in order to prevent Chambers from proposing a confirmable plan.[12] Under the

---

[11]     If the relief sought herein is not granted and the Debtors continue to refuse to negotiate with Chambers, it appears the inevitable outcome of these Chapter 11 Cases is that Chambers will ultimately propose a confirmable plan of reorganization.

[12]     The Proposed Parent Plan is patently unconfirmable as, among other things, it is premised on the assumption of contracts which may not be assumed under section 365(c)(2) of the Bankruptcy Code and which the non-debtor counterparties are entitled to terminate under section 560 of the Bankruptcy Code. *See Proposed Parent*

Proposed Parent Plan, Chambers will receive the Borrower Equity, the Limited Partner's non-insider creditors will be paid from cash on hand, and the General Partner's creditors (if any) will have claims against an empty shell.  This result could have been accomplished out of court, with less cost and delay.  Thus, it is clear that there is no valid bankruptcy purpose for the Parent Cases.

57.    **Third**, the factors identified in *Primestone Inv. Partners* heavily favor dismissal:

- There are "[f]ew unsecured creditors";

- There is "[n]o ongoing business or employees";

- the "[p]etition [was] filed on [the] eve of foreclosure";

- The Parent Cases are essentially a "[t]wo party dispute";

- The Parent Debtors have "[n]o cash or income";

- The Parent Debtors have "[n]o possibility of reorganization";

- The "Debtor[s] filed solely to create [an] automatic stay"; and

- The "[s]ubjective intent of the debtor" was to prevent foreclosure.

*See Primestone Inv. Partners, L.P.*, 272 B.R. at 557; *see also* First Day Hr'g Tr. 96:19-23 (debtors have no income producing assets other than Gaedeke Merge); Case No. 19-11161, Docket No. 24; Case No. 19-11164, Docket No. 23 (General Partner's Schedules list cash ($155.40) and non-publicly traded ownership interests (0.01% interests in the Borrower, Oklahoma River Basin, LP, and Oklahoma Merge Midstream, LP) as the General Partner's only assets, list no liabilities, and list the Agent as the General Partner's only creditor, secured or unsecured); *id.* (Limited Partner's Schedules list cash ($178,311.55), non-publicly traded ownership interests (99.9% interests in the

---

Plan, § 7.2 (Assumption of JPMC Hedge Contracts); § 7.3 (Assumption of JPMC ISDA Contract); *see also* 11 U.S.C. § 365(c)(2) (prohibiting assumption of contracts for financial accommodation); 11 U.S.C. § 560 (permitting swap participants to exercise a contractual right to terminate a swap agreement in the event of a counterparty bankruptcy).

Borrower, Oklahoma River Basin, LP, and Oklahoma Merge Midstream, LP), and a hedging agreement with JPMorgan as its only assets, list the Agent as the only secured creditor, with Gaedeke Holdings II Ltd. listed as an unsecured creditor on account of a subordinated intercompany loan,[13] and JPMorgan listed as an unsecured creditor on account of the hedging agreement which is also listed as an asset).

58.     At bottom, this is a two-party dispute that can and should be resolved by state and contract law.  *See In re Toth*, 269 B.R. 587, 590-591 (Bankr. W.D. Penn. 2001) (dismissing a case for cause pursuant to 1112(b) where the case was "nothing more than a two-party dispute over a secured debt.").   The Debtors' bad-faith filing—which neither facilitates the Debtors' reorganization or rehabilitation—only increases the parties' costs and diminishes the value of the estates.  Accordingly, Chambers respectfully submits that cause exists to dismiss the Chapter 11 Cases pursuant to section 1112(b)(1).

## II.    Alternatively, The Court Should Grant Relief From The Automatic Stay To Allow Chambers To Exercise Remedies With Respect To The Borrower Equity

59.     If the Court declines to dismiss the Parent Cases, the Court should grant limited relief from the automatic stay to allow Chambers to exercise remedies with respect to the Borrower Equity for cause, including because Chambers is not adequately protected against the diminution in value of the Borrower Equity or the Collateral, the Debtors do not have any equity in the Collateral, and an effective reorganization is not possible.  Section 362(d) of the Bankruptcy Code provides, in relevant part:

> (d) [T]he court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]

---

[13]     Chambers understands that the Gaedeke Group owns or controls all of the equity or partnership interests in Gaedeke Holdings II Ltd.

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization;

11 U.S.C. § 362(d).  While the party requesting relief from the stay has the burden of proof on the issue of the debtor's equity in property, "the party opposing stay relief has the burden of proof on all other issues."  *In re Downey Financial Corp.*, 428 B.R. 595, 608-609 (Bankr. D. Del. 2010) (*citing* 11 U.S.C. § 362(g)(1)-(2)); *see also In re Abeinsa Holding, Inc.*, 2016 WL 5867039, at *3 (Bankr. D. Del 2016) ("the burden to resist lifting of the stay rests entirely with the Debtor" for all issues except the debtor's equity in property).

60.     Courts "conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay."  *In re The SCO Group, Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007).  This Court has adopted a three-prong test to determine whether to grant relief from the stay:

1)     Whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay;

2)     Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and

3)     The probability of the creditor prevailing on the merits.

*In re Downey Financial Corp.*, 428 B.R. at 608-609 (*citing In re W.R. Grace & Co.*, 2007 WL 1129170, at *2 (Bankr. D. Del. 2007)); *accord The SCO Group*, 395 B.R. at 857 (adopting a nearly identical three prong test).

61.     All three factors weigh in favor of granting relief from the stay, and thus cause exists under Section 362(d)(1) to grant Chambers relief from the automatic stay to allow Chambers to exercise remedies with respect to the Borrower Equity and appoint a chief restructuring officer.  First, because the Debtors have admitted that their secured liabilities significantly exceed the value

of the Debtors' assets, the Borrower Equity has no value. Reed Depo. 69:13-70:18. Consequently, there can be no prejudice, much less a "great prejudice," to the Debtors or the estates if the stay is lifted.

62.    Conversely, Chambers faces significant hardship if the stay remains in place because the stay prevents Chambers from exercising control rights over the Subsidiary Debtors, and the Debtors are unable to provide adequate protection to Chambers to protect against diminution in the value of the Borrower Equity as a result of the automatic stay. The Parent Debtors, according to the Periodic Reports, have no significant assets to provide as adequate protection, and Chambers already has a lien on all of the assets of the Subsidiary Debtors. Thus, the Debtors cannot provide adequate protection to Chambers that will protect against diminution in value of Chambers' Collateral while the stay prevents Chambers from exercising its control rights. The considerable hardship to Chambers as a result of the stay thus outweighs any theoretical hardship to the Debtors that would result from lifting the stay. Indeed, lifting the stay to permit appointment of a chief restructuring officer would benefit the Debtors rather than cause them any hardship.

63.    Finally, Chambers would prevail on the merits in any state court action to exercise remedies on the Borrower Equity, as the Debtors' own admissions show that there is no dispute as to the validity of Chambers' security interests or that defaults exist under the Credit Agreement. The Debtors pledged all of the Borrower Equity to Chambers, and Chambers has perfected and valid security interests in substantially all the Debtors' assets, as the Debtors have stipulated. Interim Cash Collateral Order, para. D(ii). As a result, absent the automatic stay, Chambers would prevail in any state court action to exercise remedies on the Borrower Equity.

64.     Thus, all three factors weigh in favor of granting Chambers relief from the automatic stay. *See In re Downey Financial Corp.*, 428 B.R. at 608-609 (finding that cause existed to lift the automatic stay where all three factors weighed in favor of the non-debtor party).

65.     In addition, relief from the automatic stay is appropriate under section 362(d)(2) of the Bankruptcy Code because, according to the Periodic Reports,[14] the Parent Debtors do not have any equity in the Borrower Equity, which is wholly based on the value of the Collateral.[15]  Thus, the Borrower Equity serves no reorganizational purpose for the Parent Cases, and is not necessary to an effective reorganization. *See In re Huntington Development, LLC*, 469 B.R. 468, 477 (Bankr. D. Del. 2012) (granting relief from stay where the debtors had "no ability to present this Court with a plan for an effective reorganization" because "there is no equity in the [property] and the Debtors have no other appreciable assets"); *see also In re All Land Investments, LLC*, 468 B.R. 676, 693 (granting relief from stay "because there is no equity and the Debtor has not made any payments on the debt").

66.     Thus, under sections 362(d)(1) and 362(d)(2) of the Bankruptcy Code, the stay should be lifted here in the event that the Court does not dismiss the Parent Cases.

---

[14]     The Periodic Reports may be treated as judicial admissions.  Even if the Debtors were to amend the Periodic Reports, the original Periodic Reports would remain evidentiary admissions. *See In re Corson*, 2004 WL 5865045, at *6 (Bankr. E.D. Pa. 2004) ("In considering both the debtor's original and amended schedules, I note that the former may constitute evidentiary admissions, while the latter may constitute judicial admissions."); *In re Chlad*, 2017 WL 1102894 (Bankr. N.D. IL. 2017) (original schedules may be evidentiary admissions); *In re Hanson Dredging, Inc.*, 6 B.R. 230, 231 (Bankr. S.D. Fla. 1980) (allowing debtor to explain statements made in schedules, but finding value in schedule more credible).

[15]     As noted above, Chambers reserves all rights with respect to the value of the Borrower Equity.  Chambers merely asserts herein that, based on the Debtors' own valuation, the Debtors have no equity in the Borrower Equity and the automatic stay should be lifted to permit Chambers to exercise remedies with respect to the Borrower Equity pursuant to section 362(d)(2) of the Bankruptcy Code.  Thus, Chambers has met its burden under section 362(g) of the Bankruptcy Code to show that the Debtors do not have equity in the Borrower Equity, as evidenced by the Periodic Reports.  *See* 11 U.S.C. § 362(g) ("In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and (2) the party opposing such relief has the burden of proof on all other issues.").

### III.   The Court Should Appoint A Chapter 11 Trustee

67.   In the event the Court does not dismiss the Parent Cases or grant Chambers relief from the automatic stay, the Court should appoint a chapter 11 trustee.  Chambers justifiably cannot rely on current management to make decisions on behalf of the Debtors that are consistent with its fiduciary duties to all stakeholders.  It is precisely under these circumstances that courts routinely appoint a trustee.

#### A.  Courts Appoint A Trustee Where Creditors Cannot Trust Debtors' Management

68.    Courts will leave a debtor in possession only where current management "can be depended upon to carry out the fiduciary responsibilities of a trustee."  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985).  Where management is incapable of performing these duties, or where the confidence of creditors evaporates, a chapter 11 trustee must be appointed.  *See In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 473 (3d Cir. 1998).

69.   Section 1104(a) of the Bankruptcy Code authorizes the appointment of a trustee in a chapter 11 case in two circumstances:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, *either before or after the commencement of the case*, or similar cause []; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate[].

11 U.S.C. § 1104(a) (emphasis added).

70.   "The party moving for appointment of a trustee . . . must prove the need for a trustee under either subsection by clear and convincing evidence."  *Marvel*, 140 F.3d at 471; *see also In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989); *In re G-I Holdings, Inc.*, 385 F.3d 313, 317–18 (3rd Cir. 2004).  "If a court finds that the moving party has discharged this burden, it 'shall' appoint a trustee, 11 U.S.C. § 1104(a), but determining whether the moving party has satisfied its

burden under either subsection is committed to the court's discretion." *G-I Holdings*, 385 F.3d at 318 (citing *Marvel*, 140 F.3d at 471); *Sharon Steel*, 871 F.2d at 1225–26; *see In re W.R. Grace & Co.*, 285 B.R. 148, 158 (Bankr. D. Del. 2002).

71.     The categories enumerated in Section 1104(a)(1) "cover a wide range of conduct" and are best described as illustrative, rather than exclusive. *See Marvel*, 140 F.3d at 472 (internal citations and quotations omitted). Significantly, prepetition conduct that raises serious questions regarding management's ability to run the company without bias toward a particular stakeholder, like the conduct here, is sufficient alone to warrant the appointment of a trustee. *See* 11 U.S.C. § 1104(a)(1); *see also Sharon Steel*, 871 F.2d at 1225-1229 (cause existed to appoint chapter 11 trustee based in part on prepetition actions); *In re V. Savino Oil & Heating Co., Inc*., 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("[The debtor's] pre-petition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee.").

## B.  Cause To Appoint A Trustee Exists Under Section 1104(a)(1)

### 1.  *The Debtors' Dishonest Acts Warrant Appointing A Trustee*

72.     Section 1104(a)(1) expressly provides that dishonesty constitutes "cause" for appointment of a trustee. *See* 11 U.S.C. § 1104(a)(1). The Debtors' management conduct here was, *at minimum*, grossly dishonest.

73.     The Debtors' management orchestrated a secret transfer of nearly all of the money in the sole authorized bank account in order to thwart Chambers from exercising its contractual rights, and did so *knowing that such conduct—at every step* (i.e., *the withdrawal, the opening of the new account, the depositing of the money in that account)—violated the Credit Agreement*. *See, e.g.,* First Day Hr'g Tr. 70:7-12. Then, despite being in constant contact with Chambers as the parties sought to resolve their two-party dispute, management concealed these blatant breaches from Chambers for well over two months. *Id.* at 70:13-15. Only after Chambers discovered the

secret transfer did the Debtors begin to account for their lender's cash collateral, and then, rather than simply return the funds to the agreed-upon and authorized account, the Debtors' management and Mrs. Stener, who is not a manager, director, or employee of any Debtor, decided to file the Borrower for bankruptcy.

74. This egregious conduct alone warrants the appointment of a trustee. *See*, *e.g.*, *Marvel*, 140 F.3d at 474 (failure to make "open, honest and straightforward disclosure to the Court and creditors" falls short of complying with fiduciary obligations); *In re Grasso*, 2012 WL 13168488, at *1 (Bankr. E.D. Pa. Oct. 16, 2012) ("unrelenting dishonesty" was cause for appointment of a trustee); *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 641 (Bankr. D.N.M. 2009) ("perceived dishonesty or withholding of information" is an "independent ground for appointing a trustee"); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) (failure to disclose material and relevant information constitutes cause for appointment of a trustee); *In re Deena Packaging Indus., Inc.*, 29 B.R. 705, 708 (Bankr. S.D.N.Y. 1983) (failure to disclose relevant financial data is dishonest conduct which is grounds to appoint a trustee under section 1104(a)(1)).

75. Further, Gogo purportedly "prepaid" revenues to Oklahoma Merge twice, both on the eve of bankruptcy—in May 2019 and July 2019—but failed to disclose that fact to Chambers. Indeed, it was not until the First Day Hearing that the Debtors' counsel disclosed these prepayments. First Day Hr'g Tr. 99:3-7. Gogo, which was privy to insider information because its managers also work for Oklahoma Merge, appears to have made advance revenue payments to Oklahoma Merge for the purpose of undermining Chambers' liens. The Debtors had sufficient funds to operate their business, but with bankruptcy proceedings on the horizon, the Gaedeke Entities conspired to create "unencumbered" cash that would simply be "offset" post-petition by

the Borrower's receivables—all of which were pledged to Chambers. This insider transaction, which also was designed to deprive Chambers of its rights, is further evidence of the dishonesty and bias that underscores Chambers' deep mistrust of current management, and which is grounds for appointment of a trustee. *See*, *e.g.*, *In re Plaza de Retiro,* 417 B.R. at 641 ("perceived dishonesty or withholding of information" is an "independent ground for appointing a trustee").

### 2. *Gross Mismanagement And Conflicts Of Interest*

76.     Section 1104(a) provides that gross mismanagement constitutes "cause" for appointment of a trustee. *See* 11 U.S.C. § 1104(a)(1). Here, the Debtors' management runs every Gaedeke entity without abiding by any corporate formalities and acts as if it owes duties only to Mrs. Stener and her siblings.

77.     Unexplained transfers and diversion of assets "is evidence, at a minimum, of its incompetence or gross mismanagement and, at the most, evidence of actual fraud." *In re PRS Ins. Group, Inc*., 274 B.R. 381, 387 (Bankr. D. Del. 2001) (appointing trustee where debtor had history of transfers to insiders with no explanation); *Intercat, Inc*., 247 B.R. 911, 923 (Bankr. S.D. Ga. 2000) (diversion of substantial corporate assets to the debtor's management or to other corporations owned by management constituted mismanagement at best and fraud or dishonesty at worst; either warrants appointment of a trustee); *In re Colby Const. Corp*, 51 B.R. 113, 117 (gross mismanagement existed where the debtor's accounting system failed to reflect its financial condition); *In re Philadelphia Athletic Club, Inc*., 15 B.R. 60, 63 (Bankr. E.D. Pa. 1981) (debtor's failure to keep adequate records and commingling of assets with its parent required the appointment of a trustee).

78.     ***First***, the Debtors' conflicts are evident in their complete failure to follow corporate formalities. Mr. Reed testified that none of the Debtors nor its Gaedeke Non-Debtor Affiliates has ever held a board meeting. Reed Dep. 17:9-11; 27:3-10. Further, the various Gaedeke entities all

share an office and their employees share the same "Gaedeke" email domain. *Id*. at 29:14-30:3. This means that, for example, Mr. Reed uses the same "Gaedeke" email account no matter what Gaedeke entity is at issue.

79.     ***Second***, the same core group of individuals—Mr. Reed, Mr. Lickstein, and Mrs. Stener—make up the Directors and management for all the Debtors and their Gaedeke Non-Debtor Affiliates. First Day Hr'g Tr. 48:16-49:3. The Debtors' President, Mr. Reed, who receives his paycheck from the Gaedeke Group, is loyal to the Gaedeke family. *See* Reed Dep. 19:9-23. Mr. Reed is President of not only the Borrower, but also of Gogo, Gaedeke Energy, Gaedeke Gas Gathering, and Gaedeke Group, LLC. *Id*. at 9:11-16; 17:24-19:8. Mr. Reed and Mr. Lickstein have known the Gaedeke family for 24 and 26 years, respectively. *Id*. at 24:21-25:5.

80.     Indeed, management's profound loyalty to the Gaedeke family caused the Subsidiary Debtors to formally change their names with the Delaware Secretary of State on the eve of the Petition Dates, all to protect the Gaedeke family name from being associated with any potential bankruptcy filings. First Day Hr'g Tr. 47:24-48:12. Of course, the Debtors failed to notify Chambers about the name change, *id.* at 48:13-15, and also failed to disclose their former Gaedeke names in their chapter 11 petitions. In addition, Mrs. Stener was transitioned out of her roles as President and Director of the Debtors in May 2019 "[b]ecause we were thinking about Bankruptcy at the time, and we wanted to get [Mrs. Stener's] name off it." Reed Dep. 12:12-13:20; 15:1-6. Mr. Reed admitted that the May 2019 transition from Mrs. Stener to Mr. Reed as Director of the Borrower was done "for the benefit of companies *other than Oklahoma Merge*." *Id*. at 13:17-20 (emphasis added).[16] On information and belief, the Debtors have deepened their

---

[16]     The Debtors are seeking discovery regarding Mrs. Stener's past and current involvement with the Debtors. Upon information and belief, despite the fact that Mrs. Stener was removed as a Director and Officer of the Debtors, Mrs. Stener continues to exercise key decision-making control over the Debtors to this day. Her continued control over the Debtors' affairs further underscores the need for an independent trustee.

abuse of their corporate forms by continuing their prepetition practice of acting under the control of Mrs. Stener, despite her removal from formal roles with the Debtors.

81.    ***Third***, the Debtors' business is run entirely through a non-debtor affiliate, Gogo, which shares common ownership and management with the Debtors.   Unsurprisingly, the agreements between the Debtors and the Gaedeke Non-Debtor Affiliates are not arm's-length transactions.    For example, there were no negotiations between Gogo and the Debtors in establishing fees related to the Management Agreement, which was signed twice by Mr. Reed— once on behalf of Gogo and once on behalf of Oklahoma Merge.  First Day Hr'g Tr. 55:23-56:10; Reed Decl., Exhibit B (Cash Management Agreement, page 6).  In fact, Gogo provided services to the Debtors since 2014 without a formal agreement until February 23, 2017.  First Day Hr'g Tr. 51:1-5, 53:17-54:21.  Debtors have been unable to identify a single act that management performed to determine that the 5.5% management fee was consistent with the fair market value of those services, and have admitted that they did not commission a fairness opinion regarding the fee. *See id*. at 59:14-16.  Faced with the reality that management failed to negotiate in the Debtors' best interests, the Debtors' management (also Gogo's management) agreed that Gogo would forgo the management fee as part of their Cash Collateral Motion.

82.    Other dealings between the Debtors and the Gaedeke Non-Debtor Affiliates are also riddled with conflicts of interests.  First, the Subordinated Note was signed by Mr. Reed on behalf of both the Borrower and Gaedeke Holdings II Ltd.  First Day Hr'g Tr. 73:14-17.  Second, Mr. Reed, along with Mrs. Stener and the general counsel decided, without any negotiations, that a March 2019 $4 million transfer to the Borrower would be treated as a two-percent loan from another Gaedeke entity.  Reed Dep. 76:1-13; 77:7-8.  Third, Mr. Reed, along with counsel and Mrs. Stener, decided that Gogo would prepay revenues to the Borrower in May and July of 2019.

Unsurprisingly, there are no documents that memorialize the decision to prepay the Borrower.  *Id.* at 49:9-51:18.

83.     Management's positions in these Chapter 11 Cases also evidence their bias. Despite significant liquidity and cash concerns, the Debtors proposed to pay all prepetition amounts owed to Gogo, in effect siphoning Chambers' Cash Collateral to the Debtors' affiliate. *See Debtors' Motion for Entry of Interim and Final Orders (i) Authorizing the Debtors to Continue Their Shared Services and (ii) Granting Related Relief* [Docket No. 43].  Numerous courts have found such a situation to constitute sufficient "cause" for the appointment of a trustee.  *See*, *e.g.*, *In re SunCruz Casinos*, *LLC*, 298 B.R. 821, 830 (Bankr. S.D. Fla. 2003) (conflicting interests rendered management unable to fulfill its fiduciary duties as debtor-in-possession); *In re Fiesta Homes of Georgia*, 125 B.R. 321, 325-26 (Bankr. S.D. Ga. 1990) ("the presence of a conflict of interest constitutes cause for removal of the Debtor-in-possession from administration of this case"); *In re Nautilus of New Mexico, Inc*., 83 B.R. 784, 789 (Bankr. D.N.M. 1988) (where individual who controlled debtor-in-possession had conflicts with interests of the estate, trustee was warranted); *Cajun Elec. Power Coop. v. Central La. Elec. Coop (In re Cajun Elec. Power Coop., Inc.)*, 74 F.3d 599, 600 (5th Cir. 1995) (adopting on rehearing the dissent in 69 F.3d 746, 751 (5th Cir. 1995)) (recognizing that the "inherent conflict" caused by debtors' (a utility cooperative) board members being managers or members of the debtors' individual utility companies was sufficient by itself for the appointment of a trustee).

84.     Critically, management's conflicts prevent the Debtors from pursuing the Debtors' claims against Gaedeke Non-Debtor Affiliates.  For example, Mr. Reed is both the President of the Debtors *and* the President of Gogo.  First Day Hr'g Tr. 48:19-21; 58:11-14.  If Mr. Reed were to pursue a preference action against Gogo, then Mr. Reed would be violating his fiduciary duties

to Gogo.  If Mr. Reed were to refuse to pursue a preference action against Gogo, then he would be violating his fiduciary duties to the Debtors.  These conflicts pervade all of the Debtors and the Gaedeke Non-Debtor Affiliates, which have common management and ownership, and cannot be cured absent the appointment of an independent party to manage the Debtors.

85.    Indeed, it is under these very circumstances that courts routinely hold that management's position as a potential target of estate causes of action constitutes grounds for appointment of a trustee.  *See*, *e.g.*, *Sharon Steel*, 871 F.2d at 1220-21 (current management was unable to fulfill its fiduciary duty to pursue prepetition voidable transfers because the debtor and the recipient corporations had common management and those managers had conflicting duties to the debtor and to the recipients of the voidable payments); *PRS Ins. Group*, 274 B.R. at 387-88 (evidence of significant transfers of assets to the debtor's president and sole shareholder precluded current management from effective investigation and prosecution of potential causes of action, thus warranting appointment of a trustee).  The sheer number of potential claims the estate may assert against insiders and affiliates based on the improper actions of insiders and affiliates, as well as alter ego claims, is staggering.  Such actions may include, among others, claims for preference, fraudulent transfer, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty, as well as any alter ego claims.

86.    Further, even setting aside these conflicts, management's failure to effectively manage the Debtors independently warrants the appointment of a trustee.  Despite the Debtors filing for bankruptcy, admitting that Chambers has liens on substantially all of the Debtors' assets, and seeking approval of interim cash collateral orders that acknowledge Chambers' approval is required to spend money above the agreed amount, management has repeatedly come to Chambers seeking last-second approval of significant expenditures.  On August 23, 2019, the Debtors

requested that Chambers approve a well proposal *that same day* or risk missing out on the opportunity.  Again, on September 9, 2019, the Debtors requested immediate approval of a prepayment of approximately $2.1 million related to the Burchfield well schedule to start the next day.  *See* <u>Exhibit P</u> (September 9, 2019 Email from Josh Beets to Gregg Laswell).

87.    Management's pervasive and incurable conflicts of interest, as well as their mismanagement of the Debtors, render management unsuitable to steward the Debtors through these Chapter 11 Cases.  A trustee should therefore be appointed.

### 3.  *Appointment Of A Trustee Is Warranted In Light Of The Considerable Acrimony Between The Debtors And Chambers*

88.    The acrimony between the Debtors and Chambers constitutes independent "cause" for the appointment of a trustee.  Management's rampant dishonesty and complete disregard of their contractual and fiduciary duties to Chambers over the last year have rightly created an irreversible distrust of Debtors' management.  Furthermore, since the Subsidiary Petition Date, the Debtors have concealed their plans to resolve these Chapter 11 Cases and seemingly are working on a deeply misguided effort to propose a "new value" plan to preserve equity for the Gaedeke family while leaving Chambers impaired and preventing Chambers from proposing a competing plan that would inevitably deliver greater value to the estates.  An attempt by the Debtors to pursue a "new value" plan while preventing Chambers from proposing a value-maximizing competing plan is contrary to law.  *See Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454 (1999) (rejecting a plan where debtors took advantage of the exclusivity period to propose a plan that gives exclusive opportunity to old equity holders to receive ownership interests in the reorganized entity over the objection of a senior class of impair creditors).

89.    It is under these circumstances that courts find the acrimony or lack of cooperation between the debtor and creditors that extends beyond the healthy conflict that generally exists

warrants the appointment of a trustee. *See, e.g.*, *Marvel*, 140 F.3d at 472-73. In *Marvel*, the Third Circuit upheld the appointment of a trustee, finding that "deep-seeded conflict and animosity" between the debtor-in-possession and its creditors had risen to a level of "cause." *See id*. at 473. The court noted that "[t]he intense and high stakes bickering between the [debtor] interests and the Lenders does not instill confidence that the [debtor] interests could fairly negotiate with the creditors to whom they owe these duties, nor that reorganization will occur effectively." *See id*. at 474 (citing *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994)). Appointment of a trustee pursuant to 11 U.S.C. § 1104(a)(1) was necessary because the case was "a large and messy bankruptcy that promises to get worse without a disinterested administrator at the helm." *See id*. (quoting *Cajun Electric*, 74 F.3d at 600); *see also In re Nartron Corp.*, 330 B.R. 573, 590-91 (Bankr. W.D. Mich. 2005) (in light of "parties' inability to reach a consensus about anything," the court concluded there was "no reasonable likelihood of any cooperation between the parties in the near future" and ordered the appointment of a trustee).

90.     The Debtors' dishonesty, mismanagement, inherent conflicts of interest, and the acrimony between the Debtors and Chambers each separately constitute "cause" for appointment of a trustee. Taken together, if the Parent Cases are not dismissed and the automatic stay is not lifted to permit Chambers to exercise remedies with respect to its Collateral, immediate appointment of a trustee is warranted under section 1104(a)(1) of the Bankruptcy Code.

### C.  Appointing A Trustee Is In The Interests Of Creditors Under Section 1104(a)(2)

91.     Even absent a finding of "cause," the Court has broad discretion to appoint a chapter 11 trustee when "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . ." 11 U.S.C. § 1104(a)(2). In deciding whether to exercise its equitable power to appoint a trustee under Section 1104(a)(2), a court will "eschew rigid absolutes and look to the practical realities and necessities inescapably involved in

reconciling competing interests." *In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980). "Unlike § 1104(a)(1), § 1104(a)(2) does not require a finding of fault." *In re Euro-American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) (appointing trustee upon finding that it was in the best interests of creditors, as well as on evidence of gross mismanagement).

92.     In deciding whether a trustee should be appointed under § 1104(a)(2), courts consider: "(1) the debtor's trustworthiness; (2) past and present performance and the potential for reorganization; (3) whether creditors have confidence in present management; (4) and the benefits of appointing trustee balanced against the cost of appointment." *In re Morningstar Marketplace, Ltd*, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016) (citing *In re Eurospark Indus., Inc.*, 424 B.R. 621 (Bankr. E.D.N.Y. 2010)); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164 (Bankr. S.D.N.Y. 1990).

93.     "[W]hen reorganization is not possible, [ ] a Debtor's principal may be motivated to protect his own interests rather than the interests of creditors.  When coupled with a lack of confidence in management, and the benefits of appointing a trustee outweigh the cost, courts often find the argument for appointment of a trustee to be compelling." *Morningstar*, 544 B.R. at 305; *see also In re Patman Drilling Int'l, Inc.*, No. 07–34622, 2008 WL 724086, at *6 (N.D. Tex. 2008) (holding that trustee appointment was appropriate because of management's conflicts of interest and creditors' lack of confidence); *In re The 1031 Tax Group, LLC*, 374 B.R. 78, 91 (Bankr. S.D.N.Y. 2007) (holding that "well-founded distrust and a lack of confidence" in a debtor without more supports appointment of a Chapter 11 trustee); *In re Euro–Am. Lodging, Corp.*, 365 B.R. 421, 432 (Bankr. S.D.N.Y. 2007) (holding that lack of confidence in management and the greater likelihood that a planned sale will be consummated with a trustee justifies appointment).

94.     Here, the appointment of a trustee is in the best interests of creditors.  The Debtors are intent on dragging these Chapter 11 Cases through a long and costly process, despite having

no feasible reorganization plan.  They refuse to even entertain a sale of the assets to maximize the value of the Debtors' estates, even if the Gaedeke family could participate in an auction.  The only rational conclusion is that the Debtors seek to preserve exclusivity and pursue a "new value" plan to preserve equity for the Gaedeke family while leaving Chambers impaired.  Such an attempt to propose a "new value" plan during the exclusivity period is contrary to law.  *203 N. LaSalle St. P'ship*, 526 U.S. at 454 (rejecting a plan where debtors took advantage of the exclusivity period to propose a plan that gives exclusive opportunity to old equity holders to receive ownership interests in the reorganized entity over the objection of a senior class of impair creditors); *In re Ralph Roberts Realty, LLC*, 487 B.R. 480, 484 (Bankr. E.D. Mich. 2012) (denying confirmation of a "new value" plan that was proposed during the exclusivity period).  The expense of a chapter 11 trustee—an independent party who can streamline these proceedings and engage in meaningful negotiations with Chambers and the other creditors—is justified in light of the long and expensive litigation-based chapter 11 process that the Debtors appear to embrace.  For the foregoing reasons, immediate appointment of a trustee is warranted under section 1104(a)(2) of the Bankruptcy Code.

## IV.    **The Court Should Terminate Exclusivity**

95.    If the Court does not grant the other relief requested in this Motion, the Court should terminate the Debtors' exclusivity period to file and solicit a plan of reorganization.  Section 1121 of the Bankruptcy Code sets the period of time during which a debtor has the exclusive right to file a plan and solicit acceptances thereof to 120 and 180 days, respectively (the "**Exclusive Periods**").[17]  *See* 11 U.S.C. §§ 1121(b), (c).  Bankruptcy courts have great latitude in deciding, on a case-by-case basis, whether to terminate or extend exclusivity for "cause."  *See, e.g.*, *In re Energy*

---

[17]    As noted above, the Parent Debtors filed the Proposed Parent Plan on the eve of the expiration of their 120-day Exclusive Period for filing a plan.  The Parent Debtors have not demonstrated any intent to seek creditor approval of the Proposed Parent Plan prior to the expiration of their 180-day Exclusive Period for obtaining acceptance from impaired classes.

*Conversion Devices, Inc.*, No. 12-43166, 2012 WL 2779036, at *2 (Bankr. E.D. Mich. June 11, 2012); *In re Sharon Steel Corp.*, 78 B.R. 762 (Bankr. W.D. Pa. 1987).  Although "cause" is not defined by the Bankruptcy Code, courts normally consider the "Adelphia factors":  (1) the size and complexity of the case; (2) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists.  *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006).

96.     The legislative history and case law interpreting section 1121 make clear that "cause" is designed to be a flexible standard to balance the competing interests of debtors and their constituencies.  *See* H.R. Rep. No. 95-595, 1978 U.S.C.C.A.N. 5963, 6191; s*ee also Geriatrics Nursing Home v. First Fidelity Bank, N.A. (In re Geriatrics Nursing Home)*, 187 B.R. 128, 132 (D. N.J. 1995).  One of the fundamental purposes of Bankruptcy Code section 1121 is "to limit the delay that makes creditors the hostages of Chapter 11 debtors."  *United Sav. Ass'n. of Tex. v. Timbers of Inwood Forest Assoc., Ltd. (In re Timbers of Inwood Forest Assoc., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987).  In assessing a motion to terminate exclusivity, "a transcendent consideration is whether adjustment of exclusivity will facilitate moving the case forward toward a fair and equitable resolution."  *In re Henry Mayo Newhall Mem'l Hospital*, 282 B.R. 444, 453 (Bankr. 9th Cir. 2002); *see also In re Adelphia Commc'ns Corp.*, 352 B.R. at 590.

97.    Here, the applicable Adelphia factors weigh in favor of terminating the Exclusive Periods.  With regards to the first factor, these Chapter 11 Cases are straightforward and relatively small.  There is only one non-affiliate secured creditor—Chambers—and any resolution must flow through Chambers.  Furthermore, the Debtors' unsecured creditors have declined to serve on an official committee of unsecured creditors and are not otherwise active in these Chapter 11 Cases.

98.    The second, third, fifth, sixth and seventh factors are best viewed hand-in-hand in the present Chapter 11 Cases and weight against an extension of the exclusive periods.  Rather than have any good faith progress towards a reorganization, the Parent Debtors failed to ask for any substantive relief until the Subsidiary Debtors filed their petitions 81 days later, thereby wasting a sufficient amount of time to have made progress towards a plan while instead refusing to negotiate in good faith with the Secured Parties and propose any way forward.  *See*, *e.g. In re S.W. Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 451 (Bankr. W.D. Tex. 1987) ("In virtually every case where an extension has been granted, the debtor has shown substantial progress has been made in formulating a plan during the first 120 days.").  Even after the Subsidiary Petition Date, the Debtors have failed to even point to a possible resolution.  The Proposed Parent Plan makes no attempt to resolve the Chapter 11 Cases of the Subsidiary Debtors and therefore rings hollow as nothing more than a procedural tactic.  The Debtors allege that the Gaedeke family may sponsor a solution, but they have admitted that there are no proposals on the table.  First Day Hr'g Tr. 80:14-19.  For any such proposal to comply with the Bankruptcy Code, a marketing process or termination of exclusivity would be required.  *See 203 N. LaSalle St. P'ship*, 526 U.S. at 454 (1999) (rejecting a plan where debtors took advantage of the exclusivity period to propose a plan that gives exclusive opportunity to old equity holders to receive ownership interests in the reorganized entity over the objection of a senior class of impair creditors); *In re Ralph Roberts*

*Realty, LLC*, 487 B.R. 480, 484 (Bankr. E.D. Mich. 2012) (denying confirmation of a "new value" plan that was proposed during the exclusivity period). Thus, the Debtors have squandered their time, not shown good faith progress towards a reorganization or demonstrated reasonable prospects toward filing a viable plan, and have made no progress in negotiations with their creditors. *See Sharon Steel*, 78 B.R. at 765 (denying motion to extend exclusivity where the debtor "has not disclosed any information which would indicate sufficient progress in its negotiations to justify an extension of the exclusivity period.").

99.    The fourth factor also does not support extending exclusivity. While the Debtors are able to pay their trade creditors, they are doing so solely through the use of cash collateral at the Secured Parties' expense. *See Second Interim Order under 11 U.S.C §§ 105(a), 361, 362, 363, and 552, Fed. R. Bankr. P. 4001(b) and Del. Bankr. L.R. 4001-2 (A) Authorizing Use of Cash Collateral and (B) Granting Adequate Protection* [Docket No. 139, Exhibit A]. Finally, there are no unresolved contingencies here that would support extending the Exclusive Periods. Thus, the Debtors have failed to show cause to extend the Exclusive Periods as the above factors do not support an extension.

100.    In contrast, Chambers has consistently maintained that a sale process is the best way forward for these cases. A sale process subject to Chambers' right to credit bid would provide a market-based solution that allows the Debtors' assets to be realized and sold to the highest bidder, including the Gaedeke family if they are prepared to bid. The Debtors have rejected a sales process, presumably so that they may pursue a "new value" plan and use the ongoing cash burn of the chapter 11 process as leverage against Chambers.

101.    Upon the termination of exclusivity, Chambers would propose a plan based on the term sheet attached hereto as Exhibit A-2. Chambers' plan term sheet is simple and

straightforward—Chambers will receive the equity in the Debtors on account of its secured loans, unsecured trade creditors will be unimpaired, and the estates will prosecute their claims and causes of action against the Debtors' insiders and affiliates. This plan would deliver greater value to the estates than any other plan, aside from repayment in full in cash of all claims. Terminating exclusivity to allow Chambers to file such a plan will put these cases on a fast track toward a fair, equitable, and value-maximizing resolution. Thus, not only do the *Adelphia* factors weigh in favor of terminating exclusivity, allowing Chambers' to propose a plan will facilitate moving these cases forward.

102.     Further, the Debtors have indicated they may pursue a new value plan whereby the Gaedeke family puts forward new money to retain their equity. However, any plan proposed by the Debtors that involves new value from the Gaedeke family must be market tested under *203 North Lasalle. See 203 North LaSalle St. P'ship*, 526 U.S. 434 (1999). "This can be achieved by either terminating exclusivity and allowing others to file a competing plan or allowing others to bid for the equity (or the right to designate who will own the equity) in the context of the Debtors' Plan." *See In re Global Ocean Carriers Ltd*., 251 B.R. 31, 49 (Bankr. D. Del. 2000) (citing *203 North Lasalle St. P'Ship*, 526 U.S. at 458). Thus, any new value plan filed by the Debtors should require the termination of exclusivity to allow Chambers to propose a competing plan.

103.     Finally, exclusive periods may be "terminated because of some conduct by the debtor that is short of conduct that would justify the appointment of a trustee (where the statute provides that the exclusive period is terminated automatically) but, still, troubling conduct, for example where the debtor appears to be unable to negotiate a plan because of internal conflicts, or is mismanaging the bankruptcy case short of the need to replace management[.]" *In re Excel Mar. Carriers Ltd.*, 2013 WL 5155040, at *1 (Bankr. S.D.N.Y. 2013). If the Court decides that the

appointment of a chapter 11 trustee is not warranted here, management's bad faith conduct, internal conflicts of interest, and lack of a viable path forward warrant terminating exclusivity.

## **NOTICE**

104.    Chambers will provide notice of this motion by first class mail to: (i) the Debtors and (ii) the Office of the United States Trustee for the District of Delaware.

WHEREFORE, Chambers respectfully requests that the Court enter the Proposed Order dismissing the Parent Cases, or in the alternative, granting relief from the automatic stay, or in the alternative, appointing a chapter 11 trustee, or in the alternative, terminating the Debtors' exclusivity periods, and grant such other relief as is just and proper.

*[Signature Page Follows]*

Dated:   September 24, 2019
         Wilmington, Delaware

DUANE MORRIS LLP

*/s/ Jarret P. Hitchings*
Michael R. Lastowski (DE 3892)
Jarret P. Hitchings (DE 5564)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Telephone: (302) 657-4900
Facsimile: (302) 657-4901
E-mail: MLastowski@duanemorris.com
        JPHitchings@duanemorris.com

- and -

LATHAM & WATKINS LLP

Adam J. Goldberg, Esq. (admitted *pro hac vice*)
Jeffrey T. Mispagel, Esq. (admitted *pro hac vice*)
885 Third Avenue
New York, NY 10022-4834
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
E-mail: Adam.Goldberg@lw.com
        Jeffrey.Mispagel@lw.com

- and -

Michael J. Reiss, Esq. (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
E-mail: Michael.Reiss@lw.com

*Counsel to Chambers Energy Management, LP, as
First Lien Agent, and Chambers Energy Capital III,
LP, as First Lien Lender*

US-DOCS\110607467
DM3\6087765