# PUBLIC VERSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>PWR INVEST, LP, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 19-11164 (JTD)<br>(Jointly Administered)<br><br>Re: D.I. 155<br><br>Hearing Date: October 23, 2019 at 11:00 a.m. ET |

**DEBTORS' RESPONSE TO THE MOTION OF CHAMBERS ENERGY
MANAGEMENT, LP FOR AN ORDER (I) DISMISSING THE PARENT
CASES OR, (II) IN THE ALTERNATIVE, GRANTING RELIEF FROM THE
AUTOMATIC STAY OR (III) IN THE ALTERNATIVE, APPOINTING A TRUSTEE,
OR (IV) IN THE ALTERNATIVE, TERMINATING EXCLUSIVITY**

Oklahoma Merge, LP ("Merge") and its debtor affiliates in the above-captioned chapter 11

cases, as debtors and debtors in possession (collectively, the "Debtors"), hereby respond (this

"Response") to the *Motion of Chambers Energy Management, LP for an Order (I) Dismissing the*

*Parent Cases or, (II) in the Alternative, granting Relief from the Automatic Stay or (III) in the*

*Alternative, Appointing a Trustee, or (IV) in the Alternative, Terminating Exclusivity* [D.I. 155]

(the "Trustee Motion"), and in support thereof, respectfully represent as follows

## Preliminary Statement

1.      In this case, Chambers[2] is so unhappy about the Debtors filing bankruptcy that they

accuse the Debtors' management of being "riddled with conflicts of interest" on account of

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are as follows: Oklahoma Merge, LP (1308) (formerly known as Gaedeke Merge, LP), Oklahoma Merge Midstream, LP (8433) (formerly known as Gaedeke Merge Midstream, LP), Oklahoma River Basin, LP (0385)(formerly known as Gaedeke River Basin, LP), PWR Oil & Gas General Partners, Inc. (4963), and PWR Invest, LP (7429). The mailing address for the Debtors is: 3710 Rawlins St., Suite 1100, Dallas, Texas 75219, with copies to Pronske & Kathman, P.C., c/o Jason P. Kathman, 2701 Dallas Pkwy, Suite 590, Plano, Texas 75093 and Barnes & Thornburg LLP, c/o Kevin G. Collins, 1000 N. West Street, Suite 1500, Wilmington, DE 19801.

[2] "Chambers" refers collectively to Chambers Energy Capital III, LP and Chambers Energy Management, LP.

agreements between the Debtors and identified non-Debtor entities that Chambers and its attorneys from Latham & Watkins reviewed, approved, *and even wrote themselves* before Chambers ever entered into the Credit Agreement. Not a single word of those agreements has changed since Chambers's attorneys from Latham & Watkins last redlined them, and nothing about those agreements bothered Chambers or its attorneys before Robert Chambers signed his name to the Credit Agreement (notably signing on behalf of both Chambers Energy Management, LP and Chambers Energy Capital III, LP). What *has* changed is that the Debtors' bankruptcy petitions frustrated Chambers' scheme – in place before the Credit Agreement was ever signed – to "takeover" the Debtors' assets by imposing covenant requirements that Chambers's own internal model projected the Debtors would "never" be able to meet.

2.      In reality, Chambers gambled tens of millions of dollars of their investors' money on an inherently risky oil and gas loan made exponentially riskier by Chambers's secret expectation that Merge would never be able to meet its financial covenants. At core, Chambers's loan was grounded not in appropriate due diligence into the value of the collateral or the borrower's ability pay, but exactly the opposite: unrealistic expectations about an unproven oil and gas play underwritten by Chambers's expectation that Merge's relationship to the Gaedeke family would bail the company out when Merge inevitably defaulted on financial covenants Chambers knew it couldn't meet. Now, instead of acknowledging the truth—that the current state of commodity prices in the oil and gas industry necessarily makes the value of their collateral a fraction of what they believed it would be when they made the loan—Chambers has chosen to attack Debtors' management in a pleading rife with mischaracterizations and outright untruths.

3.      Chambers' accusations of divided loyalty and conflicted interests among the Debtors' management are not only wrong, they are outrageous. Far from failing to act in the

Debtors' interests, the Debtors' management and related entities have infused more than $12 million of additional capital into Merge *after* the parties entered into the non-recourse Credit Agreement *despite having no contractual or fiduciary obligation to do so.* Instead of invoking the bankruptcy remedies available to the company when defaults under the Credit Agreement became inevitable, Merge's management arranged for an $8 million capital contribution and a $4 million loan in an effort to place Merge on a sustainable path, and in reliance on Chambers' false assurances of a future restructuring of Merge's debt. Chambers now characterizes those very capital contributions as evidence of management's "unmitigated loyalty … to Sabine Gaedeke Stener, her siblings, and their family's businesses," when the obvious, intended, and *sole* effect of those contributions was to increase the value of Merge's business and, thereby, of Chambers' collateral *at the expense of Mrs. Stener and her family's other businesses*.

4.      Since the inception of the loan, Chambers and its current counsel from Latham & Watkins have been aware of *all* the relationships they now allege cause "pervasive," "deep-rooted," and "incurable" conflicts of interest. Specifically:

    a.      As a part of their diligence and negotiations before signing the Credit Agreement, Chambers requested, received, reviewed, and approved the Management Agreement between Merge and Gaedeke Oil & Gas Operating, LLC ("GoGo"). During deposition, Chambers' corporate representative conceded that *before* entering into the Credit Agreement, Chambers was: (i) aware of the relationship between GoGo and Merge, (ii) aware that the same person signed the Management Agreement on behalf of both parties, (iii) aware that the management fee was set at 5.5% of revenues, and (iv) *did not consider any of that to be unreasonable or conflicted*. Chambers' representative also confirmed that the Credit Agreement – negotiated on Chambers' behalf by its counsel at

Latham & Watkins – expressly incorporates the Management Agreement and excludes it from the list of prohibited transactions with borrower affiliates. Chambers' representative also admitted that GoGo charged Merge *less than half* of the $1.5 million annual management fee the Credit Agreement allows, and accurately reported the fees charged in budgets and in an independently audited year-end financial report for 2018. Put simply, Chambers and its lawyers never regarded the Management Agreement as even slightly problematic until it was expedient to do so in connection with the Trustee Motion, where they now allege that the Management Agreement reflects "deep-rooted conflicts and failures to follow corporate formalities." In reality, document discovery has shown that Chambers' only concern about the Management Agreement before they entered into the loan was whether they would be able to terminate it after springing the trap on their secret plan to "takeover" Merge's assets.

b.      Chambers and their Latham & Watkins attorneys were also aware fully aware of the Subordinated Note between Merge and Gaedeke Holdings VII, Ltd. As with the Management Agreement, the Subordinated Note is explicitly incorporated into the Credit Agreement as "Permitted Intercompany Debt" and, as with the Management Agreement, Chambers and its attorneys were provided with the Subordinated Note well in advance of entering into the loan. In fact, document and deposition discovery has shown that Chambers' counsel from Latham & Watkins *actually revised and edited the Subordinated Note* on Chambers' behalf, and that Chambers and its attorneys received a fully executed copy of the note – signed, again, by the same person on behalf of both Gaedeke entities – at loan closing. The only mystery is why Chambers' bankruptcy counsel from Latham & Watkins are so harshly critical of an instrument that Chambers'

transactional counsel from Latham & Watkins *actually helped to draft.*

5.      Chambers's repeated allegation that the Debtors' "complete[ly] fail[ed] to follow corporate formalities" is likewise belied by literally hundreds of pages of formal board actions and resolutions, partnership agreements, and corporate bylaws that Chambers and its Latham & Watkins attorneys actually received at loan closing, and without which they would not have signed the Credit Agreement. As with the Management Agreement and GH7 Note, those documents are perfectly clear and candid about the relationships between and among the Debtors, the non-Debtor entities, and other Gaedeke entities and the involvement of the same group of people as officers and directors of all of those entities. Once again, none of that caused Chambers or its lawyers any concern until it became expedient lodge accusations of disloyalty and divided interest, and the very existence of those documents exposes the simple untruth of Chambers' allegation that the Debtors do not observe corporate formalities.

6.      Even after the Subsidiary Debtors filed bankruptcy, Chambers agreed to multiple first day relief, agreed to use of cash collateral, and authorized multiple capital expenditures proposed by the Debtors. It was only after the Parent Debtors filed a request for a short extension of exclusivity (to line up the Parent Debtors' exclusivity with the Subsidiary Debtors) that Chambers filed the instant Trustee Motion. Despite the overwhelming burden of responding to such a wide-ranging motion and engaging in significant discovery on an expedited basis, the Debtors have still filed contemporaneously herewith a plan of reorganization that *inter alia* infuses new capital into the Debtors to pay Chambers the full value of their collateral (as required by the Bankruptcy Code), pay key trade vendors in full, and right-size the Debtors' balance sheet.

7.      The Bankruptcy Code provides a number of tools and mechanisms that affect and alter the debtor/creditor relationship, including, but not limited to, the automatic stay which

prohibits creditors from exercising rights they had prepetition. At bottom, the Trustee Motion is forty-six pages of a secured lender complaining that its borrower took steps to protect its assets and ultimately filed for bankruptcy protection to address a balance sheet that needs restructuring, and is premised on the fundamentally wrong idea that a borrower's management violates its fiduciary duties by placing a company into bankruptcy instead of acceding to a lender's self-serving pre-petition demands. The Debtors' bankruptcy cases were not filed in bad faith, and cause does not exist to lift the stay, nor does cause exists to grant the draconian remedy of appointing a chapter 11 trustee. For the reasons explained more fully herein, the Debtors respectfully request that the Court deny all of the relief requested in the Trustee Motion.

**Background**

A.      **The Chambers Loan.**

8.      The loan at issue in this case is a $75 million non-recourse credit facility as to which Chambers' interests are secured *only* by the Debtors' pledged collateral. Unsurprisingly, Chambers engaged transactional counsel to represent it during loan negotiations with the Debtors – counsel from the same firm that is now attacking some of the very instruments it negotiated and drafted on Chambers' behalf.

9.      Most conspicuously, Chambers transactional counsel from Latham & Watkins *actually revised and edited* the Subordinated Note between Gaedeke Holdings VII and Merge (the "Subordinated Note" or "GH7 Note") that Chambers' bankruptcy counsel from Latham & Watkins now characterize as "riddled with conflicts of interest." [D.I. 155 at 34]. In several email exchanges with Debtors' General Counsel, Chambers' transactional attorneys provided comments and extensive redline revisions to the Subordinated Note, all for the purpose of amending an existing Demand Promissory Note between Gaedeke Holdings VII and Merge to better serve Chambers'

6

interests under the Credit Agreement.[3] It is plain on the face of the Subordinated Note co-written by Latham & Watkins that the parties to the Note are related entities, and that it is signed by the same person for both entities.[4] Indeed the Credit Agreement defines the Subordinated Note as "Permitted *Intercompany* Debt," because that is exactly what everyone understood it to be. [D.I. 155-3 at 20]. As Chambers' corporate representative testified, none of that was of any concern to Chambers before entering into the Credit Agreement.[5] Nor should it have been, since the entire point of the Subordinated Note was to provide Merge with a source of subordinated insider lending, entirely to the benefit of both Merge and Chambers.

10.     Chambers also specifically examined the Management Agreement (the "<u>Management Agreement</u>") by and between Merge and GoGo.[6] At the time the loan was made, Chambers understood completely that the Management Agreement was executed by an affiliated entity[7] and was not an arms-length transaction.[8] Further, Chambers's corporate representative testified recently that Chambers did not care whether the transactions were negotiated at arms-length.[9] In his deposition, Chambers corporate representative admitted that he did not believe Mr. Reed signing on behalf of both Merge and GoGo created a conflict of interest.[10] After reviewing the Management Agreement, Chambers also determined that the management fee was reasonable.[11] In fact, the Credit Agreement expressly allows the Debtors to pay up to $1.5 Million

---

[3] *See* Email from B. Kaufman to J. Lennon dated December 20, 2017 ("attached please find further revised comments on the note, with a new cumulative redline."), a true and correct copy of which is attached hereto as **Exhibit A.**
[4] *See* G&H Note, a true and correct copy of which is attached hereto as **Exhibit B.**
[5] *See* Hendricks Depo at 88-90.
[6] *See* Transcript of Deposition of R. Hendricks dated Oct. 15, 2019 ("<u>Hedricks Depo</u>") at 23, attached as **Exhibit C**. Debtors note that the transcripts attached are rough drafts; however, in light of the turnaround between the depositions and the response deadline, rough drafts were what was available from the court reporters.
[7] *See* Hendricks Depo at 35.
[8] *See* Hendricks Depo at 38.
[9] *See* Hendricks Depo at 39.
[10] *See* Hendricks Depo at 43.
[11] *See* Hendricks Depo at 38-39.

to GoGo on an annual basis pursuant to the Management Agreement.[12] In his deposition, Chambers's corporate representative testified that the Debtors have never come close to hitting the cap, and for 2018, the amount was less than half of the allowed amount.[13] In fact, prior to filing the Transfer Motion, Chambers neither expressed nor entertained any of the concerns that now underlie the Transfer Motion.

11.     As it turns out, Chambers' only concern about the Management Agreement *before* entering into the Credit Agreement was whether it would be able to terminate GoGo as operator of the wells "post takeover" (i.e., assuming *pre-closing* that the loan would default and that Chambers would be "*taking over*").[14]

12.     Even as late as April 2019, Chambers believed that the fees charged by GoGo to Merge pursuant to the Management Agreement were reasonable,[15] and did not have any problem with the fact that the payment to GoGo was a related party transaction.[16] Interestingly, Chambers did not care about the amount paid under the Management Agreement until the Debtors did not make an interest payment in May of 2019.[17] Only then did Chambers begin to question the reasonableness of the management fee. Perhaps coincidentally, May 31, 2019 is also precisely the time that Chambers Energy Management, LP was soliciting investment for their new energy fund, Chambers Energy Capital IV, LP.[18]

13.     In addition to approving the Management Agreement, knowing of Mr. Reeds

---

[12] *See* Credit Agreement Dated December 22, 2017 (the "Credit Agreement") at § 6.8(a), at true and correct copy of which is attached hereto as **Exhibit D.**

[13] *See* Hendricks Depo at 51.

[14] *See* Email from C. Burgher to R. Hendricks dated Dec. 19, 2017, a true and correct copy of which is attached hereto as **Exhibit E.**

[15] *See* Hendricks Depo at 52.

[16] *See* Hendricks Depo at 52.

[17] *See* Hendricks Depo at 45.

[18] *See* SEC Form D Notice of Exempt Offering of Securities for Chambers Energy Capital IV, LP, at true and correct copy of which is attached hereto as **Exhibit F.**

involvement with GoGo, and approving the fees charged pursuant to the Management Agreement, Chambers also unquestionably knew of Ms. Stener's involvement with the Debtors and her family's ultimate ownership of those entities.[19] And like Mr. Reed's involvement, Ms. Stener's ownership of the Debtors did not concern chambers.[20] Again, the documents provided to Chambers in connection with the Credit Agreement made all of this clear. Among other things, the closing documents to the Credit Agreement included:

a.    Resolutions adopted by the Boards of Directors, or equivalent governing authorities, of Merge and its parents;

b.    Partnership Agreements, Certificates of Incorporation, or equivalent constitutional documents for Merge and its parents;

c.    Written consents of the partners of Merge;
Written consents of the partners of Merge's parents, specifically setting forth the partnership interests of each of those entities and, thereby, disclosing to Chambers the ownership [21]

14.    In connection with the Credit Agreement, the Debtors executed that certain Bank Deposit Account Control Agreement (the "<u>DACA Agreement</u>") related to its deposit account at BOKF, N.A. ("<u>BOKF Account</u>"). Pursuant to the DACA Agreement:[22]

- The Bank agrees to comply with any written instructions originated by [Chambers] directing disposition of funds in the Deposit Account, *without further consent by the Debtors or any other person*.

- Upon the occurrence of an Event of Default under the Credit Agreement (or at any time thereafter), [Chambers] may send a written notice to the Bank, in substantially the form of <u>Exhibit A</u>, stating that it is exercising exclusive control over the Deposit Accounts (a "<u>Notice of Control</u>"). So long as the Bank has not received a Notice of Control, the Bank may comply with instructions of the Debtor in respect of the Deposit Accounts. After the Bank receives a Notice of Control, the Bank will cease complying with instructions of the Debtor.

---

[19] *See* Hendricks Depo at 99.
[20] *See* Hendricks Depo at 99.
[21] *See* Resolutions from the closing documents, true and correct copies of which are attached as **Exhibit G.**
[22] A true and correct copy of the DACA Agreement is attached hereto as **Exhibit H.**

15.      Chambers is a sophisticated lender with principals who have been involved in private equity firms at some of the largest institutions in the world, such as Lehman Brothers. Chambers's principals have over 25 years of experience in commercial finance.[23] In performing their due diligence, they reviewed the Debtors management, the terms by which management would be paid, and the Debtors' ownership. Chambers's testimony is irrefutable that they believed the Management Agreement and the fees charged are reasonable, that they did not care that Mr. Reed was involved with both GoGo and the Debtors, and that they did not care that Ms. Stener and her family constituted the ultimate ownership. Only now that the Debtors have landed in bankruptcy and Chambers is raising capital for its new fund (where a bankruptcy has to be "explained") has Chambers for the first time alleged that the Debtors' management is conflicted and that the existence of the Management Agreement and Ms. Stener's relationship are unreasonable.

B.      **Second Amendment to the Loan Agreement**

16.      In mid 2019, the Debtor and Chambers began discussing a second amendment to the Credit Agreement. At or about that same time, on July 24, 2019, Cedric Burgher, emailed Robert Hendricks that Chambers's internal analysis and projections, "show [Merge] able to meet the leverage ratio by December 2018, **but the model projects they never meet the 1.2x Collateral Coverage Ratio."[24]** Despite knowing that the Debtors would "never meet the 1.2x Collateral Coverage Ratio," two months later Chambers incorporated those exact ratios into the Second Amendment to Credit Agreement (the "Second Amen.[25] Moreover, Chambers did not even

---

[23] *See* Chambers Energy's website, located at https://www.chambersenergy.com.
[24] *See* Email from C. Burgher to R. Hendricks dated July 24, 2018 ("July 24 Email"), a true and correct copy of which is attached hereto as **Exhibit I.**
[25] *See* Second Amendment to Credit Agreement, a true and correct copy of which is attached hereto as **Exhibit J.**

use Mr. Burgher's (the person in charge of maintaining the model used for monitoring covenant compliance) recommended coverage ratios, but instead used higher, more difficult to meet, coverage ratios. More specifically, Mr. Burgher recommended that the ratios slowly be scaled up with 1.20x collateral coverage not being required until September of 2019.[26] Instead, Chambers required the 1.20x collateral coverage ratio be met (a ratio they believed would never be met) by March 31, 2019 and thereafter.[27] As consideration for the Second Amendment, Merge was required to pay $8 Million (from an equity contribution) to Chambers. Unsurprisingly, three months after the amendment was signed, and approximately six weeks after the second portion of the $8 Million was paid, Mr. Reed was again speaking with Chambers about the Debtors difficulties in meeting the financial covenants in the Chambers loan documents.

### C.    Debtors' Good Faith Prepetition Negotiations

17.    In January of 2019, anticipating the future covenant defaults that Chambers knew were coming, Mr. Reed traveled to Houston to meet with Chambers's president, Robert Chambers, and one of the other principals, Phil Pace. At the meeting, Mr. Reed discussed the difficulties the Debtors had experienced in drilling the wells, expressed frustration with the drilling consultant employed, Bronze 4, and communicated that he believed the Debtors would not be able to meet the financial covenants. Knowing that this was coming (because their internal modeling told them six months earlier the covenants in the Second Amendment would not be met), Chambers responded at the end of January that they would be willing to reset all the covenants in exchange for another $6 Million in new equity plus $5 Million in equity (the "Chambers January Proposal").[28]

---

[26] *See* July 24 Email.
[27] *See* Second Amendment at § 2.3(a).
[28] *See* Chambers Depo at 118.

18.     In response, Ms. Stener and Mr. Reed traveled to Houston and met with Mr. Chambers and Mr. Pace. At the conclusion of the meeting, Ms. Stener communicated that the Debtors would provide a proposal to Chambers, which it did in late March first with a proposal whereby $12 Million would be invested over the next twenty-four months (the "Debtor Late March Proposal"). Shortly thereafter, the Debtors made another proposal on or about April 2, 2019 (the "Debtor April 2 Proposal").

19.     Chambers responded on April 5, 2019 to Mr. Reed proposing approximately a six-month forbearance in exchange for a payment of $10 Million (the "Proposed Forbearance").[29] The terms of the Proposed Forbearance were clear that Chambers was not waiving the covenants that it knew internally the Debtors would never meet, but instead Chambers offered to not enforce their rights and remedies. In addition, Chambers proposed to forego charging default interest since December 31, 2018, the date of the first alleged default.[30] The parties were ultimately unable to reach an agreement on a forbearance, largely because six-months later the Debtors would be in the exact same position, still unable to meet the financial covenants. Chambers of course knew this and knew the only way their non-recourse loan was going to be paid back in the current commodity price environment was to keep hammering financial covenant defaults they knew the Debtors would never meet and extract cash from the Debtors periodically.

20.     After failing to reach a forbearance, on or about May 22, 2019, the Debtors made another proposal to Chambers that involved: a $22.5 Million payment to Chambers from a new reserve-based line of credit or equity infusion, equitization of $51.5 Million of Chambers' debt, utilization of a drillco, and new equity contributions of $2.5 Million into Merge (the "Debtors May

---

[29] *See* Email from R. Hendricks to M. Reed dated April 5, 2019, at true and correct copy of which is attached hereto as **Exhibit K.**
[30] *See id.*

22 Proposal"). This Debtors May 22 Proposal was countered a week later by Chambers with a proposal that included: $74 Million debt to Chambers, extension of maturity of the note to June 30, 2021, lowered interest rate to 8%, and $20 Million in new equity (the "Chambers May 28 Proposal").

21.     In early June 2019, the Debtors' financial professionals, FTI Consulting, Inc. ("FTI"), engaged with Chambers to discuss the terms of a potential restructuring of the Debtors. The terms of that restructure were generally: $40 Million in debt to Chambers at 8% interest, equitization of the remainder of Chambers' debt, $10 Million capital infusion that would result in Chambers owning 50% and the Debtors current equity owning 50%, and the use of a drillco for a 15 well drilling program (the "June 6 Restructure Proposal"). On or about June 19, 2019, Mr. Chambers called Ms. Stener directly and communicated Chambers's counter, which involved Chambers funding an additional $10 Million for upcoming investment and in exchange they would get a 2.5x return on investment, at which point the equity would be split 75% to Chambers and 25% to Merge's equity holders.

22.     Throughout the remainder of June and July of 2019, the parties and their representatives engaged in constant communications and negotiations speaking practically on a weekly basis. On July 24, 2019, Mr. Chambers and Ms. Stener again spoke and Chambers proposed the following: Chambers would convert $39 Million of debt to 95% equity in Merge, the remaining debt would accrue interest at a "market" rate that was at least greater than 6% (the "Chambers July 24 Proposal"). Also, during the July 24 call, Mr. Chambers communicated that Chambers would be sending an acceleration notice of the debt. Later that day, Ms. Stener emailed Mr. Chambers to confirm what they had discussed on their call that Chambers would be willing to

equitalize all of its debt.[31] Mr. Chambers confirmed, but stated "at this point, I think we should both prepare for a bankruptcy filing."[32]

23.     The next day, counsel for Chambers sent correspondence (the "July 25 Demand Letter") directly to Mr. Reed, which *inter alia* stated: "The Agent and Lenders remind the officers and directors of the Borrowers' business and that the Agent and Lenders are beneficiaries of such fiduciary duties. These fiduciary duties require the Borrower to pursue the development of the Oklahoma Properties and prevent the wasting of assets from failure to develop those properties."[33] Eleven seconds later, counsel for Chambers sent correspondence to BOKF, N.A. (the "Control Notice") notifying it that Chambers was exercising exclusive control over the BOKF Account.[34] Five days after that, on July 30, 2019, Chambers sent further correspondence (the "Sweep Notice") to BOKF, N.A. directing them to "remit all currently available funds by wire transfer" to Chambers's bank accounts.[35] In summary, Chambers's counsel, Latham and Watkins, threatened to sue the Debtors if they didn't maintain Chambers's collateral, including drilling the Burchfield Trust well, and then immediately froze the Debtors' use of money and subsequently swept all of the cash.

24.     In the months leading up to bankruptcy, the Debtors and Chambers swapped no less than six to eight proposals and agreements. The Debtors tried in earnest to negotiate and reach an agreement with Chambers. Unfortunately, the parties reached an impasse and the filing of these bankruptcy cases were required to preserve the Debtors' assets for the benefit of all creditors.

---

[31] *See* Email from S. Stener to R. Chambers dated July 25, 2019, a true and correct copy of which is attached hereto as **Exhibit L.**
[32] *See* Email from R. Chambers to S. Stener dated July 25, 2019, a true and correct copy of which is included in **Exhibit L.**
[33] *See* Letter dated July 25, 2019 to M. Reed, a true and correct copy of which is attached hereto as **Exhibit M.**
[34] *See* Letter dated July 25, 2019 to Bank of Texas, a true and correct copy of which is attached hereto as **Exhibit N.**
[35] *See* Letter dated July 30, 2019 to Bank of Texas, a true and correct copy of which is attavhed hereto as **Exhibit O.**

D.      **The Bankruptcy Cases.**

25.      In the midst of the negotiations in April and May of 2019 in which Chambers was making clear that the Debtors were in default and that Chambers was not inclined to waive any defaults or covenants, and against the backdrop of the failed forbearance agreement, the Parent Debtors deemed it necessary to file for bankruptcy relief in order to protect the creditors of the Subsidiary Debtors and the Subsidiary Debtors' ability to file for bankruptcy if negotiations ultimately broke down. As explained at the first day hearing in this case, the Parent Debtors[36] pledged their equity interests in certain of the Subsidiary Debtors.[37] In addition to those pledges, the Parent Debtors also executed stock powers agreements that would allow Chambers to exercise the powers of the Parent Debtors to control the Subsidiary Debtors, thereby effectively precluding the filing of a bankruptcy on behalf of the Subsidiary Debtors. With those concerns in mind, on May 22, 2019 (the "PWR GP Petition Date"), PWR Oil & Gas General Partners, Inc. ("PWR GP") filed its voluntary petition under chapter 11 of the Bankruptcy Code. The next day, on May 23, 2019 (the "PWR Invest Petition Date", and together with the PWR GP Petition Date, the "Parent Petition Dates"), PWR Invest, L.P. ("PWR Invest") filed its voluntary petition under Chapter 11 of the Bankruptcy Code.

26.      As described above, the Debtors and Chambers continued to engage in negotiations and swap proposals for another two months after the Parent Debtors filed for bankruptcy.

27.      After Mr. Chambers July 25 email indicating that the parties were likely headed to bankruptcy, and certainly after issuance of the Control Notice and Demand Notice, the Debtors and their advisors began preparing in earnest for the bankruptcy filings for the Subsidiary Debtors.

---

[36] PWR Invest, LP and PWR Oil & Gas General Partners, Inc. shall be referred to collectively as the "Parent Debtors."
[37] Oklahoma Merge, LP, Oklahoma Merge Midstream, LP, and Oklahoma River Basin, LP shall collectively be referred to as the "Subsidiary Debtors."

To this end, Debtors' counsel reached out to Chambers' bankruptcy counsel and the parties began negotiations regarding the Debtors' use of cash collateral. It was only by happenstance that the Debtors learned of Chambers's secret plans to file a temporary restraining order, that ultimately forced the Subsidiary Debtors to file on August 12, 2019 (the "Subsidiary Petition Date").

28.    Since the Subsidiary Petition Date, the Debtors have negotiated and agreed to approximately 12 interim or final orders with Chambers and the various parties in this case, including the United States Trustee.

29.    Filed contemporaneously herewith is the Joint Plan of Reorganization of PWR Invest, LP *et al* (the "Proposed Plan") and the Disclosure Statement in Support of Joint Plan of Reorganization of PWR Invest, LP *et al* (the "Proposed Disclosure Statement"). Generally, the Proposed Plan divides the Debtors claims and equity holders into sixteen (16) classes, pays Chambers in full in cash the value of their collateral, pays key trade vendors in full, and contemplates an auction process for the equity in certain of the reorganized Debtors. As explained more fully in the Proposed Disclosure Statement and in this Response, the Proposed Plan provides for a greater recovery to unsecured creditors than any of the relief requested in the Trustee Motion, which would otherwise result in unsecured creditors receiving nothing. Alternatively, the Debtors have proposed a plan that utilizes the provisions of the Bankruptcy Code to deleverage and reorganize their balance sheet so that they can proceed forward post-confirmation.

**Argument and Authority**

## I.    THE DEBTORS FILED THEIR CASES IN GOOD FAITH.

30.    Saddled with a loan that Chambers admits it knew the Debtors would never be able to comply with, facing multiple covenant defaults, and demands from Chambers for additional

significant sums of money, and numerous good faith settlement attempts the Parent Debtors filed bankruptcy on the Parent Petition Dates to allow them to continue to negotiate with Chambers and to protect the Subsidiary Debtors' right to file for bankruptcy.  Chambers's argument that the Parent Cases were filed in bad faith ignores the financial realities of the Debtors (that their own models confirmed), the market conditions present in the oil and gas industry, and the Debtors' months-long attempts to reach an out-of-court agreement prior the Parent Petition Date and Subsidiary Petition Dates. Instead of focusing on the totality of the circumstances, as the case law in this circuit dictates, Chambers misrepresents statements made on the record and misconstrues cases analyzing dismissal issues. In truth, the Parent Debtors filed for bankruptcy to protect the Subsidiary Debtors and their ability to file for bankruptcy because a provision in the loan documents would have permitted Chambers to take voting control over the Subsidiary Debtors and keep the Debtors from having authority to file bankruptcy. Moreover, the Debtors' decision to only file the Parent Debtors (instead of all the Debtors) while they continued to engage in negotiations with a lender that was obstinate and unwilling to engage in good faith negotiations, further supports the conclusion that the Debtors filed these cases in good faith. Finally, the Parent Debtors' filing their plans within exclusivity with the need for extensions, and the Subsidiary Debtors filing the Proposed Plan approximately sixty days after filing for bankruptcy (especially in the face of a barrage of attacks from its lender) solidifies the Debtors' overwhelming good faith in filing these cases.

31.     The Third Circuit imposes a "good faith" requirement for filing bankruptcy petitions. *See Official Comm. of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 160 (3d Cir. 1999). When a debtor files a case in bad faith, courts in this circuit have held that such bad faith constitutes "cause" under section 1112 of the Bankruptcy Code. *See e.g.*

*In re 15375 Memorial Corp.*, 589 F.3d 605, 618 (3d Cir. 2009); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004).

32.     The determination of "[w]hether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" *15375 Memorial Corp.*, 589 F.3d at 618; *Little Creek Dev. Corp.*, 779 F.2d at 1072 ("Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities.). The Third Circuit has outlined two considerations when determining whether a debtor filed its bankruptcy case in "good faith": (1) the bankruptcy petition must "serve[] a valid bankruptcy purpose," and (2) the bankruptcy petitions cannot be filed "merely to obtain a tactical litigation advantage." *See Integrated Telecom Express, Inc.*, 384 F.3d at 120; *15375 Memorial Corp.*, 589 F.3d at 618; *SGL Carbon Corp.*, 200 F.3d at 165. The Third Circuit has acknowledged, in the context of a motion to dismiss for bad faith, that chapter 11 vests debtors with "considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors." *See SGL Carbon Corp.*, 200 F.3d at 165; *In re Integrated Telecom Express*, 384 F.3d at 120. When "financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified." *See SGL Carbon Corp.*, 200 F.3d at 165-66.

## A.     The Debtors' Bankruptcy Cases Serve a Valid Bankruptcy Purpose.

33.     In the last three years, the price of oil has gone from approximately $30 per barrel, to $75 per barrel, crashed back down to $42, and then back up to the mid-fifties per barrel during

the majority of this year. In the last three years, at least 155 oil and gas companies, with debts totaling over $91 Billion have filed for bankruptcy in courts around the country.[38] The bulk of those cases undoubtedly involved E&P debtors who were not in compliance with their loan covenants, owned assets that were worth significantly less than the amounts owed to creditors, and needed to restructure their balance sheets. Like many of the other E&P companies that filed for bankruptcy, the Debtors have felt the effects of the volatility of oil prices, and the value of their primary asset (the oil and gas reserves) has also been affected. As the Debtors' schedules show, the Debtors owe over $100 Million in debts to creditors, and assets, including their oil and gas reserves of approximately $30 Million. As such, like many (if not most) of the E&P debtors that have filed in the last three years, the Debtors needed to restructure their balance sheets to deleverage. Seeking bankruptcy protection to utilize the provisions of the Bankruptcy Code— including the automatic stay, exclusivity, section 506(a), and the plan provisions—is a *per se* valid bankruptcy purpose.

34.    The Debtors have filed contemporaneously herewith their Proposed Plan. Among other things, the Proposed Plan provides Chambers with a secured claim in an amount equal to value of their collateral, and pays that claims in full, in cash, on the Effective Date. Further, the Proposed Plan pays important trade vendors, vital to the Debtors' ongoing operations, in full, and distributes any remaining cash to general unsecured creditors. Finally, the Proposed Plan cancels the equity in Merge and Midstream and proposes to sell new equity interests through an open auction process in which Chambers and any other party is welcome to participate. Put simply, in the approximately sixty (60) days since the Subsidiary Petition Date (in the face of multiple attacks

---

[38]    *See* Haynes and Boone, LLP Oil Patch Bankruptcy Monitor, *available at* https://www.haynesboone.com/~/media/Files/Energy_Bankruptcy_Reports/Oil_Patch_Bankruptcy_Monitor

from Chambers), the Debtors have filed a confirmable plan that comports with the Bankruptcy

Code and utilizes the provisions of the Bankruptcy Code to restructure and reorganize the Debtors.

**B.    The Bankruptcy Cases Were Not Filed as a Litigation Tactic.**

35.    Contrary    to    Chambers's    allegations,    and    contrary    to    Chambers's

mischaracterization of Debtors' counsel's comments made at the first day hearing for the

Subsidiary Debtors,[39] the Debtors' bankruptcy cases were not filed to "gain a tactical advantage[.]"

As Debtors' counsel explained at the Subsidiary Debtors' first day hearing:

> So there was a concern that the lender could essentially foreclose or exercise
> their control rights over the subsidiaries and practically and legally,
> technically keep us from seeking relief. So we filed the two parent
> companies, **in order to preserve our right to file at the future while we
> continued to engage in negotiations with the bank**
> ….
>
> The hope was that during that period we would continue to work with the
> lenders and try to reach a mutually agreeable solution that everybody could
> agree on. I will tell the Court over the last 75 days, we've engaged in good
> faith negotiations with the lender, they've engaged in negotiations with us.
> Your Honor, the parties just reached an impasse.[40]

Since at least December of 2018, the Debtors have actively engaged Chambers in negotiations and

attempts to restructure the Debtors' balance sheets. At each turn, the Debtors have been met with

ultimately the same answer—pay us more money!

36.    As explained in depth above, during the months leading up to bankruptcy, the

Debtors's management made at least two trips to Houston to discuss and negotiate with Chambers

in person. In the seven months immediately prior to the Subsidiary Petition Date, the Debtors and

Chambers exchanged numerous proposals, spoke almost weekly and worked in earnest to reach a

---

[39] *Compare* Trustee Motion at ¶ 53 (truncating an entire clause of Debtors' counsel's statement) *with* Aug. 15 Hrg.
Transcript at 10:13-19 ("So we filed the two parent companies, **in order to preserve our right to file at the future
while we continued to engage in negotiations with the bank.**")

[40] *See* Transcript of Aug. 15, 2019 Hrg at 10:13-19, a true and correct copy of which is attached hereto as **Exhibit P.**

settlement and agreement that worked for all parties in interest.

37.    Contrary to what Chambers alleges in the Trustee Motion—that "the Debtors have

not engaged in any meaningful negotiations with Chambers…towards a potential chapter 11 plan,

and have failed to propose any alternative way for these Chapter 11 Cases to move forward"—

four days prior to Chambers filing the Trustee Motion, Debtors' counsel sent a proposal to

Chambers's counsel outlining the broad terms of a plan of reorganization.[41] The proposal provided:

(a) all trade creditors of the Debtors would be paid in full, (b) equitization of both Chambers's and

Gaedeke Holdings VII's debts, (c) equity in the reorganized Merge debtor would be 75% to

Chambers and 25% to Gaedeke VII Holdings, and (d) Chambers would receive up to the first $3

Million in proceeds from the collateral to be used by Chambers as reimbursement for their

reasonable pre and post-petition professional fees incurred in connections with bankruptcy cases

through court approval of settlement/plan.[42] Chambers responded two days later with a proposal

of their own that was not accepted by the Debtors. Within the last two weeks, to say that the

Debtors have not engaged in negotiations with Chambers is just flat not true.

38.    At least one court has noted that when there is a potential question of good faith as

of the petition date, post-petition events can and should be considered. *See In re Alton Tel. Printing

Co.*, 14 B.R. 238, 241 (Bankr. S.D. Ill. 1981). In determining whether the debtor filed its case in

bad faith, the bankruptcy court in *Alton Tel. Printing Co.*, found it significant that the debtor had

filed a plan of reorganization, the case was progressing through the court in an orderly and

expeditious manner, and that debtor had generally been cooperative with the court in proceeding

towards an orderly and equitable distribution of its assets. *See id.* Analogously, the Debtors in thse

[41] *See* Email from G. Pronske to A. Goldberg dated September 20, 2019, a true and correct copy of which is attached hereto as **Exhibit Q.**
[42] *See id.*

21

cases have either withdrawn or negotiated consensual interim orders on each of the motions they have filed, including three comprehensive cash collateral orders. In the face of the Trustee Motion that threatens to shut down and completely end the Debtors cases, the Debtors and their representatives have produced over thirty-five thousand pages of documents, sat for over twenty hours of depositions and all within a span of approximately fifteen days. During that same time, the Debtors have managed to draft and file the Proposed Plan, Proposed Disclosure Statement, and this Response. The Debtors filed these cases for a legitimate bankruptcy purpose—to restructure their balance sheets in light of the incredible market conditions facing the oil and gas industry— and the Debtors' good faith attempts at negotiations (both pre and post-petition) combined with their other post-petition actions are evidence that these Bankruptcy Cases were not filed as a litigation tactic.

### C.    Factors Commonly Considered Under Section 1112 Weigh Against Dismissal.

39.    Finally, the factors outlined by *Primestone Inv. Partners, L.P* and other cases weigh against dismissing the Debtors' cases, including the Parent Debtors' cases. In addition to the two driving factors identified by the Third Circuit, courts in this district also often use a list of thirteen factors, which include: (i) single asset case; (ii) few unsecured creditors; (iii) no ongoing business or employees; (iv) petition filed on eve of foreclosure; (v) two party dispute which can be resolved in pending state court action; (vi) no cash of income; (vii) no pressure from non-moving creditors; (viii) previous bankruptcy petition; (ix) prepetition conduct was improper; (x) no possibility of reorganization; (xi) debtor formed immediately prepetition; (xii) debtor filed solely to create automatic stay; and (xiii) subjective intent of the debtor. *See e.g. In re Primestone Invest Ptnrs L.P.*, 272 B.R. 554, 557 (Bankr. D. Del. 2002). Chambers points to eight of these factors, and in a cursory manner, argues that the eight factors they highlight apply to the Parent Debtors. However,

when the Debtors are considered as a whole, and the totality of circumstances are considered, none

of these factors support dismissal. Even Chambers concedes that the Debtors are not single asset

entities. The Debtors own hundreds of leases covering 10,500 acres. They have interests in over

seventy wells, and with the non-Debtor entities operate thirteen of those wells. The Debtors'

reserves generate millions of dollars of revenue.

40.     The Debtors, who have been in existence for multiple years, are upstream oil and

gas companies struggling to survive in the midst of a prolonged downturn in the oil and gas

industry. Merge is a party to a loan that even Chambers believes will always be greater than the

value of the Collateral. After months of failed negotiations, and facing multiple covenant defaults,

the Debtors filed for bankruptcy protection to address their balance sheets and to ensure that all of

their creditors are treated fairly and equitably.

## II.     THE COURT SHOULD NOT LIFT THE STAY.

41.     Like the request to dismiss the cases of the Parent Debtors, Chambers's request to

lift the stay as it applies to the Parent Debtors is a transparent attempt to take control of the

Subsidiary Debtors rather than engaging on those issues on a broader basis. Cause does not exist

to lift the stay, and although the Parent Debtors admittedly lack equity in the Subsidiary Debtors,

those equity interests are necessary for an effective reorganization. Accordingly, the Court should

deny Chambers's request to lift the stay.

### A.     Cause Does Not Exist to Lift the Stay.

42.     Section 362(d)(1) provides

(d)     On request of part in interest and after notice and a hearing, the court
shall grant relief from the stay provided under subsection (a) of this
section…

23

  (1) for cause, including lack of adequate protection of an interest in property or such party in interest;

11 U.S.C. § 363(d)(1). Because "cause" is not defined in the Bankruptcy Code, bankruptcy courts have the discretion to consider what constitutes cause based on the totality of the circumstances. *See In re Flintkote Company*, 533 B.R. 887, 894 (Bankr. D. Del. 2015) (*citing In re Wilson*, 116 F.3d 87, 90 (3d Cir. 1997)). The movant bears the burden of establishing a "prima facie case of cause." *See Flintkote Company*, 533 B.R. at 891.

  43. The Parent Debtors' use of bankruptcy to protect the Subsidiary Debtors and their assets is consistent with the purposes underlying the automatic stay. "There is no rigid test for determining whether sufficient cause exists to modify an automatic stay. Rather, in resolving motions for relief for "cause" from the automatic stay courts generally consider the policies underlying the automatic stay in addition to the competing interest of the debtor and the movant." *See In re Continental Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993). The automatic stay is intended "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Borman v. Raymark Ind., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991) (*quoting St. Croix Condo. Owners v. St. Croix Hotel*, 682 F.2d 446, 448 (3d Cir. 1982)); *see also In re Aleris Intern., Inc.*, 456 B.R. 35, 46 (Bankr. D. Del. 2011); *In re DBSI, Inc.*, 407 B.R. 159, 166 (Bankr. D. Del. 2009). As explained throughout this case, one of the reasons the Parent Debtors filed their cases was to prevent Chambers from taking control of the equity in the Subsidiary Debtors while those entities continued to negotiate with Chambers in an attempt to avoid bankruptcy all together. Likewise, the Parent Debtors filed their cases, along with the Subsidiary Debtors, to utilize the provisions of

the Bankruptcy Code to restructure their balance sheets and reorganize. Through the reorganization, all creditors will receive a recovery, rather than just one creditor—Chambers.

44.      In balancing the competing interests of the debtors and the lift stay movant, courts consider three factors: (1) the prejudice that would be suffered should the stay be lifted; (2) the balance of the hardships facing the parties; and (3) the probable success on the merits if the say is lifted. *See Continental Airlines, Inc.*, 152 B.R. at 424 (*citing Int'l Business Machines v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van Co.)*, 938 F.2d 734-37 (7th Cir. 1991); *In re DBSI, Inc.*, 407 B.R. at 166-67. Contrary to Chambers's belief, each of the foregoing factors weigh against lifting the stay.

> i.      *The Debtors will certainly face great hardship if the stay is lifted.*

45.      Chambers's argument for why hardship will not ensue is based solely on their argument that the Parent Debtors lack equity in the Subsidiary Debtors. Such argument completely ignores the entire corporate structure of the Debtors. If the stay is lifted, Chambers admittedly will take control of the Subsidiary Debtors and direct those cases for their own benefit, an outcome that Chambers has made clear will involve an immediate sales process where they credit-bid their debt, take the assets, and leave other unsecured creditors with zero recovery. Not only will the Subsidiary Debtors be harmed, but their creditors and estates will likewise be harmed.

> ii.      *The balance of hardships overwhelmingly weighs in favor of the Debtors.*

46.      Chambers's sole argument for why the balance of harms weighs in their favor is "the stay prevents Chambers from exercising control rights over the Subsidiary Debtors, and the Debtors are unable to provide adequate protection to Chambers to protect against diminution in

the value of the Borrower Equity as a result of the automatic stay."[43] Put differently, Chambers's argument is that they face significant hardships because they cannot exercise the rights in their prepetition loan documents. If a secured creditor's inability to exercise its rights in its prepetition loan documents because of the automatic stay was all that was required to show hardship, this factor would <u>always</u> weigh in favor of the secured lender. Chambers is not harmed by the stay being kept in place. The Borrower Equity interests cannot decrease in value. On the other hand, the Debtors <u>will</u> suffer substantial hardships. More specifically, if the stay is lifted, Chambers can and will exercise their control rights over the Subsidiary Debtors and will direct those cases for their sole benefit. Moreover, as the Debtors budgets and projections demonstrate, the value of the Subsidiary Debtors' assets, and Chambers's collateral, will increase during the pendency of these cases due to the completion of the Burchfield Trust well. Thus, the balance of hardships weighs in favor of the Debtors.

        iii.     *The Subsidiary Debtors' assets are still protected by the automatic stay.*

     47.     If the stay were to be lifted as to the Parent Debtors, Chambers would not be able to proceed with its foreclosure and exercise of control against the Subsidiary Debtors. As alluded to herein, Chambers' request to have the stay lifted as to the Parent Debtors is certainly direct at their desire to take control of the Subsidiary Debtors by exercising the stock powers they hold on behalf of the Parent Debtors. In Chambers' words, "the Court should grant limited relief from the automatic stay to allow Chambers to exercise remedies with respect to the Borrower Equity[…]."[44] Elsewhere, Chambers request the stay be lifted to permit appointment of a chief restructuring

---

[43] Trustee Motion at ¶ 62. Debtors note that in paragraph 65 there is value in the "Borrower Equity" and thus it is unclear what value they seeking to have adequately protected.
[44] Trustee Motion at ¶ 59.

officer.[45] However, even if the Court were inclined the lift the stay, such relief would not allow Chambers to control the Subsidiary Debtors, because the Subsidiary Debtors are also debtors and their assets are equally subject to the automatic stay. Section 362(a)(3) "operates as a stay, *applicable to all entities*, of…any act to obtain possession of property of the estate or property from the estate *or to exercise control over property of the estate*." 11 U.S.C. § 362(a)(3). Bankruptcy courts have held that even if an action is taken against a non-debtor, "the Court must examine <u>the effect of the action, and if that effect 'would inevitably have an adverse impact on property of the bankruptcy estate, such action should be barred by the automatic stay</u>." *See In re Saint Vincents Catholic Medical Centers of New York*, 429 B.R. 139, 146 (Bankr. S.D.N.Y. 2010) (*citing 48th Street Steakhouse, Inc. v. Rockfeller Group, Inc. (In re 48th Street Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987)). In this case, Chambers admits that it intends to take control of the Subsidiary Debtors and their assets and force a chief restructuring officer, and as such, admits that if the stay is lifted it seeks to "exercise control over property of [the Subsidiary Debtors' bankruptcy] estate. Because such attempt to exercise control over the Subsidiary Debtors' property would be a violation of the automatic stay, Chambers would not prevail if the Parent Debtors' stay was lifted. Therefore, because each of the factors weigh in favor of the Debtors, the Court should decline to lift the stay.

     **B.**     **Lifting the Stay Eliminates Any Prospect of the Subsidiary Debtors Proposing an Effective Reorganization.**

48.     Section 363(d)(2) provides:

> (d)     On request of part in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section…
>
> (2)  with respect to a stay of an act against property under subsection

---

[45] Trustee Motion at ¶ 62.

(a) of this sections, if –

    (A) the debtor does not have equity in such property; <u>and</u>

    (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2).

49.    Even though the Parent Debtors lack equity in the Subsidiary Debtors, the Parent Debtors own other assets, and as shown in the Proposed Plan, have the ability to confirm a plan of reorganization. Section 362(d)(2) is written in the conjunctive and thus both requirements must be met in for a court to grant relief. *See Matter of Grantsville Hotel Assocs., L.P.*, 103 B.R. 509, 510 (Bankr. D. Del. 1989). The Supreme Court has held that the requirement that property be "necessary to an effective reorganization" requires a showing there is a "a reasonable possibility of a successful reorganization within a reasonable time." *See United Sav. Ass'n Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 376 (1988). Further, where a debtor has a primary asset, such asset "will almost always be necessary for reorganization…and relief under 362(d)(2)(B) will be available only if the bankruptcy court concludes that reorganization within a reasonable time is no feasible." *See In re Indian Palms Assocs., Ltd.*, 61 F.3d 197, 209 (3d Cir. 1995) (*citing United Sav. Ass'n Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. at 376). More specifically, bankruptcy courts have held that where the primary asset of a debtor is the equity it has in an operating subsidiary, the equity interest is by definition necessary to an effective reorganization of the holding company. *See e.g. In re Western Preferred Corp.*, 58 B.R. 201, 209 (Bankr. N.D. Tex. 1985). As the bankruptcy court in the Northern District of Texas explained:

As the property at issue here—the capital stock of all of the Debtor's operating subsidiaries—is the Debtor's primary, and virtually exclusive, operating asset which is by definition necessary to an effective reorganization, the Collateral is absolutely critical to [the debtor's] reorganization efforts. Granting the Bank's motion to lift stay would be

> tantamount to approving the divestiture of all of the operating assets of the
> Company, thereby precluding reorganization."

*Id.* Like the debtors in *Western Preferred*, the equity interests in the Subsidiary Debtors are the primary asset of the Parent Debtor, and thus are by definition, necessary to an effective reorganization.

### III.    A TRUSTEE IS NOT WARRANTED.

50.    Upon information and belief, Chambers has yet to inform its investors that the value of the collateral securing the loan made by the fund is less than half of amount outstanding on the loan. In addition to potentially affecting the fees that Chambers Energy Management can charge CEC III,[46] such a drastic revelation arguably may affect their fundraising efforts for subsequent funds. However, if Chambers can tell their investors that it was not their risky investment strategies that lost their money, but a conflicted management team acting in their own interest, it softens the blow. Consequently, Chambers's request for a trustee focuses predominantly on the (1) the Debtors' movement of $5 Million to a separate bank account of the Debtors' where it remained until it was all returned post-petition to the BOKF Account, and (2) perceived management conflicts. When each of these instances (and each of the other instances complained of in the Trustee Motion) are examined more closely, it reveals that Chambers was not harmed by any of these actions, was not only aware of the inter-company relationships, but approved and ratified them. The Debtors' management has always acted in the best interest of the Debtors and their creditors as a whole. The appointment of a trustee is an extraordinary remedy that is unwarranted in these circumstances, especially in light of the pending Proposed Plan.

---

[46] *See* Amended and Restated Limited Partnership Agreement of Chambers Energy Capital III, LP at § 8.1 (*specifying* that after the Investment Period, the Management Fee [charged by Chambers Energy Management to CEC III] will be an amount equal to 1.5% per annum…of the lower of the Fair Market Value or Adjusted Cost of each Unrealized Investment.).

**A.      There is a Strong Presumption Against Appointment of a Trustee.**

51.      "It is settled that appointment of a trustee should be the exception, rather than the rule. *See In re Marvel Entm't Group, Inc.*, 140 F.3d 463, 471 (3d Cir. 1998) (*quoting In r Sharon Steel*, 871 F.2d 1217, 1226 (3d Cir. 1989)). In general, the debtor remains in possession through the reorganization because "current management is generally best suited to orchestrate the process of rehabilitation for the benefit of creditors and other interests of the estate." *See id.  (citing In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989)). As a result, there exists a "strong presumption against the appointing of an outside trustee." *See id.* The determination of whether a trustee should be appointed is made on a case-by-case basis and must be proven by *clear and convincing evidence. See In re G-I Holdings, Inc.*, 385 B.R. 313, 317-18 (3d Cir. 2004) (emphasis added); *In re Marvel Entm't Group*, 140 F.3d at 471; *In re Sharon Steel*, 871 F.2d at 1226. For the reasons explained more fully herein, Chambers cannot carry this burden as to section 1104(a)(1) or (a)(2) of the Bankruptcy Code and therefore the Court should deny the request to appoint a trustee.

**B.      Cause Does Not Exist to Appoint a Trustee.**

> i.      *Chambers's claims of dishonesty lack truth and their arguments for appointment of a trustee is not supported case law.*

52.      At the end of May 2019, the Parent Debtors had already filed for bankruptcy. The Debtors knew they had substantial upcoming capital expenditures to finish the Burchfield trust (an expenditure that Chambers would later threaten to sue the Debtors if they didn't make such expenditures), and that because of their existing defaults Chambers had an absolute right to sweep the Debtors' funds at any point without warning pursuant to the DACA Agreement. With these risks and realities in mind, the Debtors made the decision to move their cash to a separate deposit

account to ensure that operational expenditures, including the completion of the Burchfield Trust could be completed.

53.     It turns out that the Debtors' fears were justified. Just eleven seconds after Chambers sends the Debtors' management an email admonishing them and warning them that they would  be in breach of their fiduciary duties if they did not complete the Burchfield Trust, Chambers sent correspondence to BOKF, N.A. (where the BOKF Account was located) informing BOKF not to take any further direction from the Debtors' management, which would have included any direction from the Debtors' management to pay amounts related to the Burchfield Trust.[47] Five days later, without any advance notice to the Debtors, Chambers sent the Sweep Notice directing BOKF to wire any funds in the BOKF Account to Chambers.

54.     The cases cited by Chambers in support of dishonesty as providing a basis for appointment of a trustee are all distinguishable. Each of the cases cited by Chambers in the Trust Motion on this point involved a debtor (1) making a false statement or withholding information, (2) post-petition. *See Marvel*, 140 F.3d at 474 (failure to disclose post-petition facts surrounding litigation that was impetus for the central dispute in the case that lead to the animosity and appointment of a trustee); *In re Grasso*, 2012 WL 13168488 *2 (Bankr. E.D. Pa. Oct. 16, 2012) (post-petition failure to identify in bankruptcy schedules interests in loans which were the source of post-petition financing, failure to disclose all of his assets, failure to disclose his receipt of estate assets resulting from a sale); *In re Plaza de Retiro, Inc.*, 417 B.R. 632, 642 (Bankr. D.N.M. 2009) (debtor testified at the 341 meeting that insurance coverage was in place, when he knew it has been cancelled, debtor attached insurance documents related to a cancelled policy to his initial reports); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) (debtor's

---

[47] *See* Correspondence to BOKF – Control Notice.

principal setup a parallel business to usurp opportunities of the debtor and did not disclose that a substantial part of the debtor's business was being conducted by the other entity, that the other entity was selling fuel to the debtor's customers, or even the existence of the other entity started by the principal); *In re Deena Packaging Indus., Inc.*, 29 B.R. 705, 708 (Bankr. S.D.N.Y. 1983) (debtor failed to disclose in its bankruptcy schedule two substantial revenue generating leases as assets, nor did the debtor schedule certain brokerage liabilities related to those leases).

55.     In contrast, the Debtors have been fully transparent about their relationship with the non-Debtors. More specifically, the Debtors filed a first day motion that was ultimately deemed unnecessary, but for the primary purpose of transparency. Attached to the First Day Declaration of Mark Reed [D.I. 39] was an organizational chart and a copy of the Management Agreement that governs the relationship between the Debtors and GoGo. What is more, is the use of a separate entity (different from the one owning the oil and gas leases) to operate wells is common in the oil and gas industry.

56.     Chambers also complains of GoGo's "prepayment" of revenues to Merge, which is curious because the effect of those payments was to increase the value of Chambers's cash collateral. More specifically, because those amounts paid/advanced to Merge from GoGo were ultimately transferred to the BOKF Account, they are subject to Chambers's liens and became their cash collateral. Equally, when GoGo receives the cash post-petition, such amounts will constitute proceeds from the sale of Chambers's collateral and thus will also be cash collateral. Accordingly, the payments made by GoGo inured to Chambers's benefit because it increased their collateral.

57.     Finally, Chambers accusing the Debtors of dishonesty is a bit like the pot calling the kettle black. In July of 2018, Chambers's vice president sent an internal email that reads: "Our

current projections show the Company able to the meet the leverage ratio, by December 2018, **but the model projects they never meet the 1.2x Collateral Coverage Ratio**."[48] Approximately two months later, knowing that the Debtors would never meet a 1.2x Collateral Coverage ratio, Chambers sent the Second Amendment to the Debtors to sign, which required that the Debtors attain a 1.2x Collateral Coverage ratio by March 31, 2019 and maintain it going forward.

        ii.    *Chambers's Allegations of Management's bias towards the Gaedeke Family are False.*

58.    In the context of section 1104(a)(1) of the Bankruptcy Code, "[g]ross mismanagement suggests some extreme ineptitude on the part of management to the detriment of the organization…But it must rise above simple mismanagement to achieve the level envisioned by the Code." *See In re Sundale, Ltd.*, 400 B.R. 890, 907 (Bankr. S.D. Fla. 2009) (*citing In re Mako, Inc.*, 102 B.R. 809, 812 (Bankr. E.D. Okla. 1988)). As explained by another court, "[t]he factors used to determine gross mismanagement vary depending on the facts of the case, but often include elements that hint at fraud, in addition to negligence." *See In re Microwave Prod., of Am., Inc.,* 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989). Poor management alone does not warrant appointment of a trustee. *See In re St. Louis Globe-Democrat, Inc.*, 63 B.R. 131 (Bankr. E.D. Mo. 1985); *In re La Sherene, Inc.*, 3 B.R. 169 (Bankr. N.D. Ga. 1980). In this case, Chambers's allegations of gross mismanagement center around their perceived belief of conflicts of interests and the Debtors' interactions with non-Debtor entities. Yet, Chambers has known since the beginning of Ms. Stener and Mr. Reed's involvement with the Debtors and non-Debtors, knew and approved of the management agreement with GoGo and the terms contained therein, and attorneys at Latham & Watkins drafted the complained-of subordinated debt. Chambers can hardly allege

---

[48] *See* July 24, 2018 Email from C. Burgher to R. Hendricks (emphasis added), a true and correct copy of which is attached hereto as **Exhibit R.**

that these interactions give rise to a level of fraud, when they intimately knew of each of these facts and approved of them.

59.      Chambers first complains that the Debtors' president's mistaken testimony that that there were no board minutes is evidence that the Debtors failed to follow corporate formalities, which constitutes gross mismanagement sufficient to rise to the level of appoint a chapter 11 trustee.[49] When reviewing his testimony after the deposition, Mr. Reed corrected his testimony that the Debtors have had board meetings and do have minutes. Perhaps more importantly though, the Debtors have consistently followed corporate formalities and have produced no less than six independent examples of resolutions and corporate actions documented and kept in the minutes of the Debtors. But even if the Court were to express concern over the Debtors' corporate formalities, irregularities in corporate formalities are not "cause" to appoint a trustee. *See In re Sundale, Ltd.*, 400 B.R. 890, 902 (Bankr. S.D. Fla. 2009) (*holding* that where the failure to follow corporate formalities did not defraud any creditors, such failure was not a basis to find that cause existed to appoint a trustee."). Here, Chambers does not point a single harm that was caused by their allegation that the Debtors failed to follow corporate formalities, and also does not point to a single case that holds that a mere absence to follow corporate formalities is "cause" to appoint a trustee.

60.      Chambers further argues that the Debtors' sharing office space with non-Debtors and Mr. Reed's use of a single "gaedeke.com" email address constitutes gross mismanagement and is a basis for appointing a trustee.[50] If sharing office space and using a single email was evidence of gross mismanagement, then Chambers itself would be guilty of such a charge, as Chambers's officers and directors also use a single "chambersenergy.com" email address,

---

[49] *See* Trustee Motion at ¶ 78.
[50] See Trustee Motion at ¶ 78.

regardless of which fund it is acting on behalf of. Similarly, Chambers Energy Management, LP and Chambers Energy Capital III, LP, as well as other presumably related entities, Chambers Energy Capital II, LP, and Chambers Energy Capital I, LP, share office space in Houston, Texas.

61.     Chambers next complains that the non-Debtors and Debtors are managed by similar individuals and argues that because Mr. Reed is paid by Gaedeke Group, an entity setup to employ individuals used by the Debtors and non-Debtors, he is "loyal" to the Gaedeke family.[51] In support of this argument, Chambers cites Mr. Reed's deposition testimony that reads:

> Q.     I assume you are paid for your work on behalf of the various Gaedeke entities?
> A.     Yes.
> Q.     Who pays your salary?
> A.     Gaedeke Group.
> Q.     You don't receive a paycheck from Oklahoma Merge?
> A.     No.
> Q.     You don't receive a paycheck from GoGo?
> A.     No.
> Q.     You don't receive a paycheck from any of the entities that we see in the organizational chart of Exhibit A, other than Gaedeke Group?
> A.     Correct.

Nowhere in Mr. Reed's testimony does he testify that he is "loyal" to the Gaedeke family. Moreover, Chambers alleges that because of management's "profound loyalty to the Gaedeke family," the Subsidiary Debtors changed their names to protect the Gaedeke family. In truth, in March 2019, Ms. Stener chose to resign as an officer of the Debtors and stepped down as an officer because of a health problem that had recently been diagnosed. Because of the unknowns associated with Ms. Stener's health and how she would respond to treatment, she determined that it was in the Debtors' best interest that she resign as an officer while she focused on her health. Because Ms. Stener was no longer involved with the day to day operations of the Debtors, her siblings also

---

[51] *See* Trustee Motion at ¶ 79.

stepped down as directors and Mr. Reed was promoted to oversee the day to day operations of the Debtors.

62.     Next, Chambers complains that the Debtors' "business is run entirely through a non-debtor affiliate, GoGo, which shares common ownership with the Debtors."[52] "Unsurprisingly,  the agreements between the Debtors and the Gaedeke Non-Debtor Affiliates are not arms-length transactions."[53] When asked in his deposition about the topic of the Management Agreement, Chambers's corporate representative testified: (1) Chambers was aware of the Management Agreement with GoGo since the inception of the loan, (2) knew at the inception of the loan it was not an ams'-length transaction, (3) expressly approved the Management Agreement with GoGo as a part of its due diligence when it entered into the loan, (4) expressly approved the fees charged in the Management Agreement, (5) thought the fees charged in the Management Agreement were reasonable, and (6) that they did not care how the fee was determined.[54] Furthermore, the Credit Agreement expressly lists the Management Agreement as a Material Contract,[55] and expressly authorized the Debtors to pay GoGo up to $1,500,000 in management fees pursuant to the Management Agreement each year.[56] Not once at any time did Chambers complain about the Management Agreement, and Robert Chambers testified that he did not have any reason to believe that the Management Agreement constituted gross mismanagement.

63.     Other bases of gross mismanagement alleged by Chambers include (a) that the Subordinated Note was signed by Mark Reed both on behalf of the borrower and the lender, (b) the Debtors' proposal to pay prepetition amounts to GoGo, (c) Mr. Reed's potential conflict with

---

[52] *See* Trustee Motion at ¶ 81.
[53] *See* Trustee Motion at ¶ 81.
[54] *See* Hendrick Depo at 23-43.
[55] *See* Credit Agreement at Schedule 3.29.
[56] *See* Credit Agreement at § 6.9(a).

pursuing non-Debtor entities, and (d) alleged last-minute request to approve drilling requests.[57] Again, like the Management Agreement, Chambers reviewed and approved the Subordinated Note as a part of the Loan Agreement.[58] Not only did Chambers review and approve the Subordinated Note, their own lawyers drafted the Subordinated Note.[59] The Debtors' proposal to pay GoGo going forward was (1) only in the ordinary course, (2) subject to cash collateral usage, and (3) ultimately withdrawn. In addition, GoGo agreed to forego the management fees that Chambers agreed to and believed to be reasonable. Finally, the Debtors' last-minute request to prepay the Burchfield Trust came because Haliburton had not previously indicated that the Debtors would be required to prepay for the drilling. As soon as the Debtors learned that Haliburton was requiring a prepayment, the Debtors' professionals, FTI, contacted Chambers's professionals, Opportune, to seek approval for the payment. Regardless, none of these instances are of the substance and magnitude to rise to the level of gross mismanagement and none of these facts justify the imposition of a trustee.

64.     Although courts in this circuit have held that extensive and continuous animosity during a chapter 11 case can constitute "cause" to dismiss a case, the adversarial nature of this case is not of the level and degree that warrants the appointment of trustee. In the pinnacle case on this issue, *In re Marvel*, the Third Circuit held that a private equity holder (Carl Icahn) who was a creditor and who took control of the debtor post-petition, and who was independently engaged in litigation with lenders of the debtors, and whose litigation animosity carried over into the decision he was making on behalf of the debtor once his entities took over ownership of the debtor constituted cause to appoint a trustee. *See In re Marvel*, 140 F.3d at 468-69. Likewise, the facts in

---

[57] *See* Trustee Motion at ¶ 83-86
[58] *See* Hendricks Depo at 77.
[59] *See* Hendricks Depo at 85.

*In re Nartron Corp.* involved a bankruptcy case that had been pending for over two and one-half years, where the debtor was engaged in litigation on multiple fronts, and with multiple parties. *See generally*, 330 B.R. 573 (Bankr. W.D. Mich. 2005). In contrast, the Subsidiary Debtor cases have been pending less than seventy-five days. Although Chambers and the Debtors have had disagreements over the use of cash collateral, the parties have ultimately agreed on three interim cash collateral orders, and multiple other interim and final orders in these cases. With regard to the Trustee Motion, the parties have worked to resolve differences of opinion on a number of issues, and although there have been status conferences with the Court to address discovery issues, such disagreements certainly do not rise to the level of animosity described in *Marvel* and *Nartron*.

65.     The Debtors and Chambers certainly disagree on what the ultimate outcome of the cases will be, but that does not mean that the case is so acrimonious that a trustee should be appointed.  By this logic, any time a debtor did not simply acquiesce to its secured lender's demands, there would be cause to appoint a trustee. In this regard, Chambers's chief complaint is that the Debtors have "concealed" their plan of reorganization. Putting aside the fact, and that such plan until filed is certainly protected by the attorney-client and work-product privileges, their own pleading belies their argument. In paragraph 102 of the Trustee Motion, Chambers states "the Debtors have indicated they may pursue a new value plan whereby the Gaedeke family puts forward new money to retain their equity."[60] Debtors counsel has had at least two separate conversations with Chambers' counsel during the pendency of this case regarding how a proposed plan may be structured, including how classes may be structured, how certain of those classes may be treated, and how Chambers's claims may be treated. To argue otherwise is just simply inaccurate.

---

[60] *See* Trustee Motion at ¶ 102.

**C.      Appointment of a Trustee is Not in the Best Interests of Creditors.**

66.      The Debtors have proposed a plan of reorganization and have set a hearing to consider approval of their Proposed Disclosure Statement on November 26, 2019. Section 1104(a) of the Bankruptcy Code allows a court to appoint a trustee "if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate[.]" 11 U.S.C. § 1004(a)(2). "Courts construing this subsection 'eschew rigid absolutes and look to the practical realities and necessities' of the record to determine whether the appointment of a trustee is in the best interest of the estate." *See In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990). Here, the "practical realities and necessities of the record" are that a trustee is unnecessary. Despite every attempt by Chambers to derail the Debtors' proposing a plan of reorganization, the Debtors have filed their Proposed Plan contemporaneously herewith and are moving as expeditiously as possible towards confirmation. The "practical reality" is that the cost of a trustee is far outweighed by any benefit. Chambers will have the opportunity to be heard on the Proposed Plan and they will no doubt lodge objections. If the Court ultimately chooses not to confirm the Proposed Plan, Chambers can certainly file a new request for relief under section 1112.[61] Regardless, the Debtors have filed a comprehensive plan of reorganization and should be given an opportunity to confirm their plan.

67.      Moreover, the factors often considered in determining whether a court should exercise its powers under section 1104(a)(2) weigh against appointing a trustee. Factors courts consider include: (a) the trustworthiness of the debtor; (b) the reasons the debtor acted as it did; (c) reliance and harm to another party; and (d) conclusive evidence of detriment to the estate, and possibilities of future rehabilitation. *See In re* Evans, 48 B.R. 46, 48 (Bankr. W.D. Tex. 1985); *see*

---

[61] *See* 11 U.S.C. § 1112(b)(4)(J).

*also In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (listing similar factors). The predominant factor that Chambers focuses on is the Debtors' possibility of rehabilitation.[62] As described above, the Debtors and Chambers have differing views on whether the Debtors can confirm a plan of reorganization. The Court should accordingly deny the Trustee Motion and the issue should be adjudicated in the context of these Cases. The trustworthiness of the Debtors is not in question. Throughout the cases, the Debtors have been upfront and transparent with the Court, the United States Trustee and all parties in interest, including Chambers. Additionally, as described above, the Debtors have explained the rationale and reasons for the acts they undertook, including, but not limited to, the prepetition protection of the Debtors' cash.

68.    Perhaps one of the most persuasive factors is the third—reliance and harm to another party. There has been no harm to the Debtors' bankruptcy estate. Even the $5 Million complained of was returned to the DACA Account after the Subsidiary Petition Date. As explained above, the "prepayments" from GoGo inured to Merge's (and ultimately Chambers) benefit, and it increased Chambers's collateral base. Merge's reserves are increasing in value as a result of completion of the Burchfield Trust and thus Chambers can prove no harm other than they have not been able to exercise their rights under the prepetition loan agreements because of the automatic stay.   Simply put, in the approximately sixty days since the Subsidiary Debtors have been in bankruptcy, they have negotiated multiple interim and final orders with Chambers (including extremely lengthy and complex cash collateral orders), have responded to numerous discovery requests on an expedited basis, and proposed a comprehensive plan of reorganization. The benefit of a trustee (none) is substantially outweighed by the cost. Consequently, the Court should deny the request to appoint a chapter 11 trustee.

---

[62] *See* Trustee Motion at ¶¶ 93-94.

## IV.   EXCLUSIVITY SHOULD NOT BE TERMINATED

69.     The Debtors have filed contemporaneously herewith their Proposed Plan. Section 1121(b) of the Bankruptcy Code provides that "[e]xcept as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of order for relief under this chapter." 11 U.S.C. § 1121(b). However, section 1121(d)(1) provides that "on request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180 day period referred to in this section." 11 U.S.C. § 1121(d)(1). Because "cause" in this context is not defined by the Bankruptcy Code, courts have often used the following factors: (1) the size and complexity of the case; (2) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made progress in negotiations with its creditors; (7) the amount of time which has elapsed in the case; (8) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (9) whether an unresolved contingency exists. *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006). Each of the foregoing factors weigh in favor of denying Chambers's request to terminate exclusivity.

70.     The size and complexity of this case militates against terminating exclusivity sixty day into the case. Oil and gas exploration businesses are inherently complex. *See In re Gulf Oil Corp.*, 404 B.R. 407, 411 (Bankr. S.D. Tex. 2009). As a prefatory note, even Chambers does not seem to dispute that the case is large and complex.[63] This case involves over one hundred million

---

[63] *See* Trustee Motion at ¶ 98 (no reference to the first factor).

in debt, hundreds of leases, five different Debtors, and over seventy different oil and gas wells. The loan and collateral documents are hundreds of pages long and there have been over 35,000 pages of documents produced between the parties in this case. The case is sufficiently large and complex that exclusivity should not be terminated sixty days into the case.

71.    The second, third, fifth, sixth and seventh factors also weigh against terminating exclusivity. The Subsidiary Debtors' cases have been pending for approximately sixty days. Considering that the Bankruptcy Code allows for a minimum of 120 days to permit a debtor to negotiate and formulate a plan, arguing that sixty days is sufficient is counter to the Bankruptcy Code and the legislative intent of Congress. Notwithstanding the extremely short period and the Debtors attention to cash collateral and this baseless Trustee Motion, the Debtors have filed their Proposed Plan.

72.    Chambers admits that the Debtors are paying their debts as they become due. Instead, they argue that the fourth factor does not support extending exclusivity because the Debtors are "doing so solely through the use of cash collateral at the Secured Parties' expense."[64] Such arguments is a non sequitur. Chambers has a lien on all of Merge's assets, including the cash generated from Merge's oil and gas assets, so of course creditors are being paid from the cash collateral. Consequently, the fourth factor also weighs against terminating exclusivity.

73.    The Debtors have worked at a break-neck pace during these cases to not only respond to all of the discovery requested related to the Trustee Motion and the Cash Collateral Motion, but also to prepare a comprehensive plan of reorganization. For all the reasons explained herein, including the fact that there is a pending plan of reorganization filed within the exclusive

---

[64] See Trustee Motion at ¶ 99.

period and there is currently a hearing scheduled to consider approval of the Proposed Disclosure

Statement, the Court should deny the request to terminate exclusivity.

WHEREFORE, the Debtors respectfully request, for the reasons explained herein, that

the Court enter an order denying all of the relief requested in the Trustee Motion and granting the

Debtors such other and further relief as the Court may deem proper.

Dated: October 18, 2019
      Wilmington, Delaware            Respectfully submitted,
      **Public Version filed on:**
      **October 23, 2019**           BARNES & THORNBURG LLP

                       */s/ Kevin G. Collins*
                       David M. Powlen (DE No. 4978)
                       Kevin G. Collins (DE No. 5149)
                       1000 N. West Street, Suite 1500
                       Wilmington, DE 19801
                       Telephone: (302) 300-3434
                       Facsimile: (302) 300-3456
                       Email: David.Powlen@btlaw.com
                       Email: Kevin.Collins@btlaw.com

                       -and-

                       PRONSKE & KATHMAN, P.C.

                       Gerrit M. Pronske (*pro hac vice*)
                       Jason P. Kathman (*pro hac vice*)
                       Brandon J. Tittle (*pro hac vice*)
                       2701 Dallas Parkway, Suite 590
                       Plano, TX 75093
                       Telephone: (214) 658-6500
                       Facsimile: (214) 658-6509
                       Email: gpronske@pronskepc.com
                       Email: jkathman@pronskepc.com
                       Email: btittle@pronskepc.com

                       *Counsel for Debtors and*
                       *Debtors in Possession*